## WALKER–SMITH CO. v. COKER et al.

### No. 2389.

Court of Civil Appeals of Texas. Eastland.

Dec. 3, 1943.

Rehearing Denied Jan. 14, 1944.

Darroch & McCartney, E. M. Davis, and Wilkinson, Johnson, Griffin & Bohannon, all of Brownwood, for appellant.

Oscar Callaway and Y. W. Holmes, both of Comanche, for appellee.

GRISSOM, Justice.

Walker-Smith Company obtained a judgment against C. C. Coker in Brown County on April 9, 1930. On May 19, 1930, an execution was issued to Brown County and returned by the sheriff on the same day; the return showed that no property of C. C. Coker subject to execution was found in said county. On May 4, 1940, another execution was issued to Brown County and returned on May 6th with a like notation. On May 2, 1942, an execution was issued to Comanche County and levied upon the merchandise in a grocery store operated by the Cokers and known as the "City Grocery" in Comanche. Two days later Mrs. Georgia Coker took possession of said merchandise under her claimant's oath and bond. Another execution was issued on May 9th and levied on the fixtures. The fixtures were delivered to Mrs. Coker under a different affidavit and bond. The property was claimed by Mrs. Coker as her separate property.

Under the direction of the court plaintiff, Walker-Smith, joined issue with the defendants, the Cokers, alleged the facts heretofore stated, and that the property was community property and subject to plaintiff's writs of execution. (Art. 7411). Plaintiff further alleged, among other things, that if said property had been purchased by Mrs. Georgia Coker and if it became her separate property, that thereafter the business was operated by C. C. Coker; that the stock of groceries had been

replenished from time to time out of funds obtained from the sale of said merchandise in the operation of said business from the original investment and profits arising from the sale of merchandise; that all of said funds had been commingled without regard to the original investment and profits from the business in such manner that the property had become community property; that the Cokers had no other means of livelihood than the income from said business; that they had drawn money from said business to support themselves and their children; that a large portion of said goods had been purchased on credit; that C. C. Coker in the operation and management of said business had obligated himself to pay therefor; that no attempt had been made to keep a separate account of the community funds and separate funds of Mrs. Coker; that said property became community and subject to the payment of the debts of C. C. Coker.

Defendants answered, among other things, that the levies were unlawful because the judgment was dormant because the writs of execution were issued more than ten years after the "due issuance" of the last preceding execution on May 19, 1930; that "the pretended issuance of an execution on May 6, 1940, was not in fact the issuance of an execution; instead it was a mere formality, without intention of placing it in the hands of the Sheriff for collection, and which was never placed in his hands for such purpose and no attempt was ever made by the Sheriff to collect the same. Instead, the same was placed in his hands by the Plaintiff with instructions to him, in substance, to return the same immediately Nulla Bona, and such was then and there done by the Sheriff, and no attempt was made to collect the same. They show that the Plaintiff then knew C. C. Coker did not live in Brown County, and had no property there, and that if he had any property, it was in Comanche County."

Defendants further alleged that the property levied on was the separate property of Mrs. Coker; that she married C. C. Coker in 1941; that he was then employed by M. O. Coker and Mrs. Kendrick, who then owned the City Grocery; that on July 31, 1941, Mrs. Coker purchased the stock of groceries and fixtures and paid therefor with her separate means; that the business was continued under the management of C. C. Coker; that after the purchase by Mrs. Coker defendants had "made no additions to the business derived from the business income, it taking the entire proceeds of said business to pay the operating expenses and losses incident." Defendants also filed a cross-action for damages.

The cause was submitted to a jury and the jury found, among other things, that the stock of groceries was the separate property of Mrs. Coker and was not community property. The jury found that the Cokers had suffered no damage as a result of the levy of the writs of execution.

Defendants' requested issue number 1 is shown only by the judgment. The judgment recites that it was submitted to the jury but not answered. In the judgment the court found that the jury's failure to answer said issue was immaterial. The issue, as stated in the judgment, is: "Do you find, from a preponderance of the evidence that the Walker-Smith Company did not act in good faith when they sued out the writ of execution of date May 4th, 1940, on their judgment in cause No. 2805 County Court of Brown County and did not act in good faith in placing same in the hands of the Sheriff of Brown County *with not with* the Bona Fide intent that they should try to collect the same from C. C. Coker." (Italics ours. We assume that by the italicized words was meant "without" and consider the issue as if it were so written.)

The judgment decreed that plaintiff take nothing and that Mrs. Coker recover all right, title and interest in the stock of groceries and fixtures levied on by plaintiff, and that the Cokers take nothing against plaintiff on their cross-action for damages. Plaintiff has appealed.

Plaintiff presents three points. The first is: "The uncontradicted testimony of Defendants proved that, out of her separate funds, Defendant, Mrs. Georgia Coker, purchased and paid for the business in Comanche, Texas, known as "The City Grocery" on July 31, 1941, after her marriage to Defendant, C. C. Coker, and thereafter, until the execution in this case was levied on the stock of merchandise on May 2, 1942, defendants operated said business under the assumed name of 'The City Grocery'. That they purchased merchandise for cash and on credit, and daily sold said merchandise for cash and on credit, using the proceeds and profits from such sales for the purpose of *replenishing* said stock from time to time as needed, and to support themselves and their family. All prof-

its from the sale of said merchandise under the law were community property of defendants. Since said profits were used, invested and reinvested from day to day in purchasing more merchandise, they were thereby commingled with the original invested capital in said merchandise, and the burden of proving that particular items and portions of said merchandise, if any, levied upon were paid for by her out of her original invested capital was upon Defendant, Mrs. Georgia Coker. Having failed to prove the particular portions or items, or that any portion or any items of said merchandise so levied upon were paid for out of her said original invested capital, separate and apart from that portion or those items of merchandise which were paid for out of the turn-over, or profits from the original stock of merchandise, all of said merchandise so levied upon thereby became and was the community property of Defendants, liable for the payment of Appellant's judgment against Defendant, C. C. Coker, and an instructed verdict in Plaintiff's favor was proper. It was, therefore, the duty of the trial court, as to said merchandise so levied upon and here involved, since an instructed verdict was proper, to enter judgment non obstante veredicto in favor of Appellant, upon its motion timely filed, and the trial court's failure to so enter such judgment upon such motion was error, entitling Appellant to a judgment here, reversing and rendering this case."

Plaintiff's motion for judgment notwithstanding the verdict, relative to the community character of the stock of groceries only, was overruled.

C. C. Coker testified in part as follows:

"I managed the business. Mrs. Coker stays in there too, and also looks after the household affairs. I stay in the store all the time.

"We bought groceries on credit from most of the wholesale people. I did the buying. We bought on open account. We ran the business that way all the time.

"We did an average Saturday's business of between four and five hundred dollars, and an average monthly business of around two thousand dollars; the year around.

"We did not take an inventory when my wife bought into the business.

"When I pay for groceries, my wife does not sell more property to pay for them. She sells the goods and buys more goods.

"My wife goes ahead just like any other business, checks on the money, sells goods, gets some money and buys some more goods, and just automatically keeps the business going like most businesses run on the credit. My wife takes the proceeds of the business, deposits it in the bank; pays the expenses out of that; buys new goods out of that fund.

"She would sell, say, five hundred dollars worth of goods, and pay for what she bought, and pay the expenses and go on.

"My wife hasn't put any funds in the business except the $2000.00 she originally invested.

"We sell on credit—fifteen and thirty days. We have some accounts receivable that are not paid. You always do when you sell on credit.

"We take out salaries and profits, and living expenses and try to keep the stock the same as when my wife bought in the business.

"If we sell forty cans of beans today, of course, we take the proceeds and replace it with goods. We use proceeds also to pay our bills and send the children to school.

"We have no books to show the stock turn-over or what we do with the stock turn-over. We took the money we made in the business and paid our living expenses and bought new stock with it.

"We buy and pay off each two weeks, the 15th and 1st. This is our rule of doing business. There is where we replenish our stock, to buy on two weeks credit.

"We buy on credit from Comanche Wholesale, Waples-Platter, Radford & Company, Cooper and most all of them. Bought three or four or five hundred dollars per month from Radford & Company. It would vary. Bought less from Cooper than anybody else. Comanche Wholesale Grocery usually runs about four hundred dollars per month and we pay them every two weeks. We have some unpaid bills.

"My wife had a bank account. In paying the family expenses we drew on the account and on the cash drawer both I reckon. The cash receipts were deposited in her name of course.

"The cash receipts come through the cash drawer. She put them in the bank and we both drew on them."

Mrs. Georgia Coker testified in part as follows:

"Mr. Coker was managing the business when I married him and he continued after I married him. He bought the stock to replenish the stock as was sold when needed.

"We didn't keep an inventory of what we sold and what we replaced. We just bought what we needed.

"We did not keep an inventory of the profits of the business. Our city business is mostly thirty days business. We buy on the same period of credit that we sell on.

"We do not know exactly what our profits have been any month since we have been there.

"We have been operating on profits, and living out of the business and keeping the business going out of what we made. That has been our way of operating ever since I started in business with Mr. Coker.

"I just let the business revolve around and take care of itself out of the proceeds of the sales.

"I have no account showing definitely what the profits of the business have been during the time I have operated.

"I can't to save my life tell this Court and jury definitely what profits have been made. Don't have any idea.

"After I bought in, we had fixed salaries of about $100.00 per month. Maybe sometimes wouldn't use quite a hundred and sometimes maybe would use more. Expenses of sending the children to school were got out of the store.

"We didn't keep any books. Paid ourselves as we needed it and as the children needed it, and it all came out of the business."

The testimony of the president of the bank where the defendants did business was that the "City Grocery" carried an account with said bank; that C. C. Coker drew the checks on that account and made the deposits; that the activity of the account, that is, the deposits, and withdrawals, were about the same as the average store in Comanche; that the store account was in the name of the "City Grocery" until May 2, 1942, the day on which plaintiff caused the writ of execution to be levied on the stock of groceries; that the City Grocery account was closed may 2nd and on the same day an account was opened in the name of Mrs. Georgia Coker with the same amount of money that had previously on that day been in the City Grocery account.

The defendants' contention is summarized in its brief as follows: "That said business was conducted by a continuous turn-over without putting any of the profits derived from said business, in the business, but by purchasing from the sales a like amount of stock so as to keep the business running evenly at the same value that it was at the time Georgia Coker purchased it on July 31, 1941, and the evidence showed that the profit from the business had been taken away from it as the profit accrued, for the use of Mrs. Georgia Coker and her husband, C. C. Coker, for their personal expenses and for other uses."

It is true that Mrs. Coker testified at one time "We have no profits". This conclusion is conclusively shown to be erroneous by the testimony of both defendants when their entire testimony is considered. In Epperson v. Jones, 65 Tex. 425, 428, the Court said: "We also discard all such general statements as that the goods were bought with the separate property of the wife, and that there was no community property of herself and Jones, for these are conclusions of law to which the witnesses could not testify, and which are not justified by the evidence from which they are drawn."

For the purpose of this opinion we assume that Mrs. Georgia Coker purchased the stock of groceries and the fixtures in the City Grocery from its former owners and paid therefor $2000 out of her separate funds, and that, therefore, on July 31, 1941, the day of the purchase, the stock and fixtures were her separate property. The testimony of the defendants, briefly stated, shows that after Mrs. Coker purchased the stock and fixtures Mr. Coker continued to operate the business as its manager; that the Cokers had no other means of livelihood than the proceeds from the sale of groceries; that they and their children lived out of the store; that the proceeds of the sale of groceries were indiscriminately used, that is, without regard to whether it was proceeds of the sale of the separate property of Mrs. Coker, or reinvested capital, or profits, or salaries of Mr. and Mrs. Coker and further that all proceeds of the sale of merchandise, not then used for living expenses and not then paid for more merchandise, were deposited in a common bank account and checked on for all purposes by both; that no inventory of the stock of goods was taken when it was purchased by Mrs. Coker or there-

after; that no record showing profits or losses was kept; that it was impossible for anyone to know the amount of profits made by the business; that they bought and sold on credit as the average grocery store did; that when an account for merchandise was due it was either paid for out of the cash drawer or the common bank account, without any regard, or knowledge, as to whether said funds were derived from the sale of the separate property of Mrs. Coker, or whether it was in whole or in part reinvested capital, profits, or salaries. In other words, proceeds of the sale of separate property, proceeds from the sale of goods bought with such proceeds, profits, salaries and all income went into a common fund found either in the cash drawer or the common bank account. No records were kept showing "how much" of any of the things mentioned above were constantly for nine months reinvested in new stocks of merchandise or how much was used by the family.

In considering the question whether the court should have rendered judgment for plaintiff (as to the stock of groceries only) notwithstanding the verdict, or, stated differently, in considering whether defendants raised the issue that the stock of groceries levied on was the separate property of Mrs. Coker, it is necessary to consider the hereinafter mentioned legal propositions.

■ It is undisputed that the original stock of groceries, as well as the stock levied on nine months later, were acquired during the marriage of the Cokers. It is, therefore, presumed to be community property and the burden of proving its separate character is on the defendants. John Hancock Mutual Life Ins. Co. v. Bennett, 133 Tex. 450, 458, 128 S.W.2d 791; Smith v. Bailey, 66 Tex. 553, 554, 1 S.W. 627; Hardee v. Vincent, 136 Tex. 99, 147 S.W.2d 1072.

■ Profits on investments of the wife's separate estate in a mercantile business are community property and liable for the husband's debts. Claflin v. Pfeifer, 76 Tex. 469, 473, 13 S.W. 483; Epperson v. Jones, 65 Tex. 425, 428.

■ The salaries of the Cokers were community property. Mrs. Coker's salary, although community, was not subject to the payment of her husband's debt; but when her salary was converted into merchandise it became subject to the payment of the husband's debts the same as any other community property. Strickland v. Wester, 131 Tex. 23, 25, 112 S.W.2d 1047; Art. 4616.

■ The record discloses that the proceeds of the sale of merchandise, salaries, profits and all income were mixed and mingled in a common bank account, and in the store's cash-drawer, and used by both husband and wife indiscriminately, without regard to its source or character as separate or community property, in the payment of all expenses and the purchase of new merchandise. In Smith v. Buss, 135 Tex. 566, 573, 144 S.W.2d 529, 532, Justice Critz said: "Generally speaking, it is the law that a bank account consisting of separate and community funds commingled in such a manner that neither can be distinguished from the other must be regarded as a community account. Saylor v. Saylor, 20 S.W. 2d 229." Also see Rippy v. Rippy, 49 S.W. 2d 494, 496, writ refused.

The record shows conclusively that most, if not all, of the stock of merchandise levied on was purchased on credit, as had been the custom during the nine months intervening between the purchase of the original stock by Mrs. Coker and the levy of the writ of execution. In Epperson v. Jones, 65 Tex. 425, 429, the court, speaking of the operation of a mercantile business by a wife, said:

"* * * she cannot purchase on credit, but must confine herself to buying for cash only, and be ready to show that the money so used is her separate means. If the profits made upon sales of the goods are mingled with her separate money in the purchase, she must be prepared to show how much of her own money entered into the purchase. The burden of proving this is not upon the creditor who seizes the goods for her husband's debts.

"Applying these principles to the present case, we think the plaintiffs below should have shown, with greater certainty, how much of the proceeds of her original stock was used in the purchase of the goods levied on. She should further have more clearly shown how much of these proceeds were her separate property, and how much were profits, or community estate of herself and husband." Also see Middlebrook Bros. v. Zapp, 73 Tex. 29, 10 S.W. 732.

■ The wife's separate property may undergo changes and yet retain its separate character; but, where her separate property has undergone mutations and changes, in order to hold it as her sepa-

rate estate she must then be able to trace and identify it in its changed condition, and, if it is not all shown to be her separate property, the wife, in order to protect it from her husband's creditors must be able to prove how much is separate and how much is community. The record shows conclusively that defendants made no such proof and cannot do so.

In Smith v. Bailey, 66 Tex. 553, 554, 1 S.W. 627, 628, the Supreme Court said: "As it is the presumption that property found in the possession of either husband or wife during marriage is community estate, and this presumption must be overcome by satisfactory proof, it follows that, without such proof as to how much separate and how much community means were used in the purchase of a stock of goods in the possession of the wife, it cannot be determined that she has any separate interest in them whatever. The burden of proof is upon her to show these facts in rebuttal, and not upon the creditor who seeks to subject them to the husband's debt."

The court further said: "The goods in her store at that time were her separate property. She did business with them from that time on, selling them in the usual course of trade, and with the proceeds of the goods replenished her stock. From the date of her marriage down to the time when the witness Meeks took charge of the store, a period of about three years, we have not one particle of testimony to show how much of the profits of the business entered into the purchase of goods to keep up the stock. The stock must have gone through many mutations before passing into Meeks' charge. Separate property and profits had been mingled at various times and in varied proportions in the purchase of this and preceding stocks. The presumed community character of this stock was not disproved, and, under the evidence, was subject to the husband's debts."

And further, "* * * if the evidence had stopped here, leaving the goods in the possession of Mrs. Bailey's employe, with a prima facie community character stamped on them, which was not disproved by showing how much of Mrs. Bailey's separate means went into their purchase, no other finding would have been justified except that they were subject to the execution. But the evidence went further. Witnesses stated, without contradiction, that goods to keep up the stock were bought on credit, and that this manner of purchasing continued for years. It was held by this court in Epperson v. Jones, supra, that goods purchased by the wife on credit for merchandising purposes become community property. * * * As a portion, at least, of the goods levied on, or those for which they were substituted, were bought on credit, that much of community property subject to the husband's debts was represented in the stock levied on. The claimant having failed to show how much was thus made common property of herself and husband, the presumption should have prevailed that the entire stock was of this character."

The record shows that Mrs. Coker paid for both the fixtures and the stock of groceries on hand on July 31, 1941, not to exceed $2000. The stock of groceries was levied on by plaintiff on May 2, 1942. Defendants testified that from the time of the purchase until the date of the levy nine months later, defendants sold on an average of about $2000 worth of groceries each month, thus showing that the stocks of groceries had been sold and replenished more than nine times before the levy. Defendants did not attempt to point out a single article of merchandise that was on hand when Mrs. Coker invested her money in the business or that was known to have been paid for with her money. She testified she had no idea of the amount of profits made. They kept no records showing profits or stock changes. Part of the salaries of both Mr. and Mrs. Coker appear to have gone into the purchase of stocks of groceries. Profits, personal earnings, proceeds generally from the sale of groceries purchased day after day for nine months following the original investment went into the payment of new merchandise. The purchase price of new merchandise, store expenses and living expenses were paid indiscriminately out of the cash drawer and out of the common bank account. Groceries to renew and replenish the stock were constantly bought from wholesale grocers on credit. Under the circumstances, when the entire testimony of the defendants is considered, it is impossible for anyone to say "how much", if any, of the groceries on hand were the separate property of Mrs. Coker. Defendants, therefore, completely fail to meet the test prescribed by the Supreme Court, as requisite to prove the separate character of the merchandise, in Smith v. Bailey, 66 Tex. 553, 554, 1 S.W. 627; Epperson v. Jones, 65 Tex. 425, 429; Claflin v. Pfeifer, 76 Tex.

469, 473, 13 S.W. 483; Rousseau v. Featherston, Tex.Civ.App., 291 S.W. 273, writ dismissed; Mayor v. Breeding, Tex.Civ.App., 24 S.W.2d 542, 545, writ refused; and, Howard v. Howard, Tex.Civ.App., 48 S.W.2d 489, 496, writ refused. Their testimony further showed that they could never make such proof.

■ We conclude that there was no evidence to justify the submission of an issue to the jury as to whether or not the stock of groceries was the separate property of Mrs. Coker. The court erred in overruling plaintiff's motion for judgment notwithstanding the verdict, so far as the stock of groceries was concerned.

■ An entirely different situation is revealed with reference to the fixtures. Apparently the fixtures in the store at the time of the levy were the same fixtures purchased by Mrs. Coker on July 31, 1941. They were her separate property and not subject to the levy of an execution on a judgment against her husband. Plaintiff concedes the judgment is correct as to the fixtures.

Defendants (appellees), by cross-assignment of error, complain of the action of the court in "failing to require the jury to answer" defendants' requested issue number one, in holding that issue to be immaterial and rendering judgment without regard to that unanswered issue. The issue submitted, as shown by the transcript, is stated as follows: "Do you find, from a preponderance of the evidence that the Walker-Smith Company did not act in good faith when they sued out the writ of execution of date May 4th, 1940, on their judgment in cause No. 2805 County Court of Brown County and did not act in good faith in placing the same in the hands of the Sheriff of Brown County with not with the Bona Fide intent that they should try to collect the same from C. C. Coker."

Defendants contend that there is evidence that the issuance of the writ by the clerk and the delivery to the sheriff was a mere formality; that plaintiff did not intend for the sheriff to attempt to collect the judgment, but, on the contrary, that plaintiff, in effect, instructed the sheriff not to attempt to collect the judgment, but to immediately make a return showing that nothing was found subject to execution. The court submitted said issue at the request of defendants. The jury failed to answer it. The court received the verdict and rendered judgment thereon and recited in the judgment that said issue was deemed "immaterial and irrelevant to any findings and judgment herein." These matters are disclosed only by the judgment. Defendants, by their cross-assignment of error, complain only of that part of the judgment.

■ It is doubtful whether we have authority to consider defendants' cross-assignment of error. No exception was taken to the action of the court and no motion for a new trial was filed. Defendants, for the first time, complain of said action of the court and said part of the judgment by their cross-assignment presented in their brief in this court. Texas R.C.P. 324 contemplates the filing of a motion for new trial in all cases not expressly excepted. However, it does provide that "a motion for new trial shall not be necessary in behalf of appellee, except when he complains of the judgment or a part thereof." If defendants' cross-assignment "complains of the judgment or a part thereof", within the purview of R.C.P. 325, defendants were not relieved of the necessity of filing a motion for a new trial. The matter complained of is shown alone in the judgment. The judgment of the court that defendants' said issue was immaterial is made a matter of complaint. R.C.P. 374 provides that when a motion for new trial is required, it shall constitute the assignments of error on appeal, and that a ground of error not distinctly set forth in the motion for new trial shall be considered as waived.

Defendants' cross-assignment is entirely separate and independent of any question raised by plaintiffs' (appellants') points. Under somewhat similar circumstances it has been held that such a cross-assignment of error could not be considered. Towery v. Plainview Bldg. & Loan Ass'n, Tex.Civ.App., 99 S.W.2d 1039, 1042, writ refused; Bain v. Smith, Tex.Civ.App., 97 S.W.2d 353, 354; Garitty v. Halbert, Tex.Civ.App., 235 S.W. 231; Hardwicke v. Trinity Universal Ins. Co., Tex.Civ.App., 89 S.W.2d 500, 504; Texas Co. v. Graham, Tex.Civ.App., 107 S.W.2d 403, 404; Duren v. Houston & T. C. Ry. Co., 86 Tex. 287, 291, 24 S.W. 258; Stillman v. Hirsch, 128 Tex. 359, 365, 99 S.W.2d 270. In First National Bank in Graham v. Corbin, Tex.Civ.App., 153 S.W.2d 979, 981, the court said:

"Since appellees did not except to the judgment, their cross-assignment of error just mentioned will be overruled. Garitty v. Halbert, Tex.Civ.App., 235 S.W. 231; Southern Underwriters v. Williams Lumber Co., Tex.Civ.App., 38 S.W.2d 177; Hill v. Lester, Tex.Civ.App., 69 S.W.2d 474; Hardwicke v. Trinity Universal Ins. Co., Tex.Civ.App., 89 S.W.2d 500."

However, it is not necessary to decide this question for reasons hereinafter disclosed.

█ We recognize the established law that issuance of an execution means more than the mere clerical preparation and attestation of the writ; that for an execution to be "issued" it is required that the writ be delivered to an officer for enforcement. 18 Tex.Jur. 577; 33 C.J.S. Executions, § 67, p. 208; Cotten v. Stanford, Tex.Civ.App., 147 S.W.2d 930; General American Life Ins. Co. v. Ramp, 135 Tex. 84, 92, 138 S.W.2d 531; Harrison v. Orr, Tex.Com. App., 296 S.W. 871, 875; Bourn v. Robinson, 49 Tex.Civ.App. 157, 107 S.W. 873.

█ Defendants say that the evidence raises the issue that the execution dated May 4, 1940, was not issued in good faith. At least one execution had theretofore been issued on the judgment. It was issued to Brown County on May 19, 1930. The sheriff's return thereon showed that he could not find any property in Brown County belonging to C. C. Coker subject to execution. The execution that was levied on the stock of groceries was issued on the 9th day of May, 1942. If the execution dated May 4, 1940, was wholly inoperative as such, plaintiff's judgment was dormant at the time the stock of groceries was levied on. See Art. 3773, R.S. 1925, amended Acts 1933, 43rd Leg., p. 369, ch. 144, Vernon's Ann.Civ.St. art. 3773. The execution issued by the clerk on May 4, 1940, shows the sheriff's return thereon as follows: "Came to hand the 6th day of May, 1940, and executed the 6th day of May, 1940, at 9 o'clock A.M. Nulla Bona. Nothing found in Brown County subject to execution." By introducing the judgment and said three writs of execution and the sheriff's returns thereon, plaintiff did all that it was required to do to show prima facie a valid, subsisting judgment and timely and valid levy. Defendants contend that they raised the question of lack of good faith on the part of the plaintiff in connection with the issuance of the writ dated May 4, 1940. They argue that the question was raised by the fact that it was issued to Brown County; that plaintiff had salesmen travelling over the country selling groceries to retail grocers; that they called on the City Grocery in 1940 and knew that C. C. Coker was then the manager of a grocery store in Comanche County; that since the sheriff's return on the writ shows the writ was received by the sheriff on the 6th day of May and executed on the same date at nine o'clock in the morning, the sheriff only had it in his possession about an hour, and, therefore, the proper inference to be drawn therefrom is to the effect that plaintiff instructed the sheriff not to attempt to collect the judgment but to immediately make his return showing nothing was found. They further argue that, since the sheriff's return was in ink and apparently made by the same person and at the same time, and because the words in the printed form for the sheriff's return "by levying on the following described property as the property of defendant" had a pencil mark run through them, that it should be inferred that plaintiff prepared the return for the officer in advance and had the sheriff immediately make such return upon receipt of the execution; that, therefore, there was evidence that the execution was issued as a mere formality and in bad faith, without intent on the part of the plaintiff to try to collect the judgment. The only direct testimony on the question came from an agent of the plaintiff, who testified that said execution was issued with the intent and for the purpose of collecting the judgment. We see no ground for an inference of bad faith from the fact that the execution was issued to Brown County. Prior to the change in the execution statutes, the first execution was required to be issued to Brown County. (See Art. 3780, Vernon's Ann.Civ.St. art. 3780, and R.C.P. 622.) This was done. Thereafter, plaintiff could have an execution issued to any county. So far as the records show, if those in charge of the management of plaintiff's business in 1940 knew that he was manager of a store in Comanche County, defendants show no reason why plaintiff should have expected to be able to collect their judgment by having an execution issued to Comanche County. The record indicates that Mr. Coker owned no interest in the business he was then operating in Comanche County, and that he had nothing out of which the judgment could have

been collected in Comanche County. This was more than a year before Mrs. Coker purchased the City Grocery in Comanche County. The sheriff is presumed to have performed his official duty. There is no evidence indicating and certainly no reason to believe that plaintiff was deliberately trying to avoid collection of its judgment. We have considered the entire statement of facts so far as it could have any bearing upon this question. We conclude that the evidence is insufficient to raise the issue submitted in defendants' requested issue number one. We think no reasonable inference could be drawn from the testimony raising an issue of bad faith in the issuance and return of the execution of May 4, 1940. Garrett v. Hunt, Tex. Com.App., 283 S.W. 489, 491; Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059. Since the evidence did not raise the issue, it was not reversible error for the court in rendering judgment to disregard the unanswered issue.

The judgment is reversed and judgment rendered for plaintiff against the defendants and the sureties on their claimant's bond for the stock of groceries. The judgment as to the fixtures is affirmed.