**Elizabeth Terry DUNCAN and The State National Bank of El Paso, Independent Executors of The Estate of Ernest Allen Duncan, Deceased, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 16310.**

United States Court of Appeals Fifth Circuit.

July 18, 1957.

Rehearing Denied Oct. 1, 1957.

Eugene T. Edwards, El Paso, Tex., for appellant.

C. Moxley Featherston and Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, and Holvey Williams, Asst. U. S. Atty., El Paso, Tex., for appellee. Hilbert P. Zarky, Atty., Dept. of Justice, Washington, D. C., Russell B. Wine, U. S. Atty., San Antonio, Tex., for the United States.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The problem here is whether the following items in the Estate of Dr. Duncan:

| | | |
|---|---|---|
| Item I. | 16 stocks purchased principally through [1] the Hutton & Co. account | $73,268.54 |
| Item II. | Credit balance Hutton & Co. account | 1,783.97 |
| Item III. | State National Bank, El Paso, balance account in name of E. A. Duncan | 6,636.33 |
| | | $81,688.84 |

should be treated as the separate property of the decedent or as community property of decedent and his surviving widow. The Commissioner determined that each was separate property. In the Estate's suit for refund, 28 U.S.C.A. § 1346(a) (1), the Court, without a jury on formal findings and conclusions, upheld the Government's contention of separate property.

As the nature of the property interest of the decedent, separate or community, under Texas law determines the impact of the Federal estate tax, Hopkins v. Bacon, 282 U.S. 122, 51 S.Ct. 62, 75 L.Ed. 249; Lang v. Commissioner, 304 U.S. 264, 267, 58 S.Ct. 880, 82 L.Ed. 1331, the controversy rages around the immemorial statutes [2] and considerable

---

1. The Estate asserts, and the Court found, that subitems (16), (20), (26) and (29) were "Over-the-Counter" purchases not through Hutton & Co. account. This is apparently inaccurate as detailed records show that (26) Keystone and (29) Selected Industries were purchased through Hutton on March 11, 1949 (not 1948 as printed record indicates) for $3400 and $1869.58, respectively. The price paid on purchase October-November 1947 is not shown, but value at death is fixed for subitems (16) American Research at $4850 and (20) Loomis-Sayles at $9793. Subitem (25) Hugoton Products was a stock dividend not purchased through any account, see note 8, infra.

2. The statutory definitions are reciprocal, i. e., that which is received during coverture is community *unless* it qualifies as separate property.

Art. 4619, Vernon's Tex.Ann.Civ.Stat., Community Property: "Sec. 1. All property acquired by either the husband or wife during marriage, except that which is the separate property of either, shall be deemed the common property of the husband and wife; and all the effects which the husband and wife possess at the time the marriage may be dissolved shall be regarded *as common effects* or gains, unless the contrary be satisfactorily proved * * *."

Art. 4613, Vernon's Tex.Ann.Civ.Stat.,

body of Texas law which, without a doubt, favors the community and puts on one asserting a contention of separate property in husband or wife a heavy burden.

The Estate's case was simply made. And, with a candid forthrightness, it insists that to the extent the record does not, or cannot, indicate the facts as to the origin of the money which produced Items I, II and III, the presumption operates to make it all community even though, without contradiction and established as an absolute fact, community income during the three years (1947, 1948, 1949) of this short three-year marriage available [3] for investment was only $16,737.19. The result would be that, with neither showing nor purpose of showing circumstances from which gifts of the husband's separate property to the community could be inferred, the application of the presumption not only turns the sow's ear into a silk purse, but by alchemist's wizardry, fills it with gold by

Husband's separate property: "All property of the husband, both real and personal, owned or claimed by him before marriage, and that acquired afterwards by gift, devise, or descent, as also the increase of all lands thus acquired, shall be his separate property. * * * During marriage the husband shall have the sole management, control, and disposition of his separate property, both real and personal."

Art. 4614, Vernon's Tex.Ann.Civ.Stat., Wife's separate property: "All property of the wife, both real and personal, owned or claimed by her before marriage, and that acquired afterward by gift, devise, or descent, as also the increase of all lands thus acquired, shall be the separate property of the wife * * *."

3. They were married October 28, 1946.

For the full years (1947, 1948, 1949) the total net income of the community, including capital gains (or losses) in the stocks held by the husband prior to marriage, the total of deductions for contributions, state and federal income taxes, and the net available for spending and investment was as follows:

| Item | 1947 | 1948 | 1949 |
|---|---|---|---|
| Net Income | $5,221.62 | $6,968.02 | $7,177.80 |
| Less: Contributions, State and Federal, Taxes | 1,084.30 | 943.76 | 1,200.29 |
| Net income available for spending-investment | $4,137.32 | $6,024.26 | $5,977.51 |

For the short year 1946, disregarding altogether gains from the sale of his premarriage property, the net income for dividends, interest, professional income was $3,588.62. After deducting contributions, state and federal income taxes actually paid totaling $2,394.88, only $1,193.74 was available. The presumptions would neither permit nor require a holding that *all* was earned in the last two months during marriage. The Government's estimate of ⅙ ($598.10) for this purpose is conservative, although later on, for apportionment, we include the whole ($1,193.74).

The maximum total available was:

| | |
|---|---|
| 1946 | $ 598.10 |
| 1947 | 4,137.32 |
| 1948 | 6,024.26 |
| 1949 | 5,977.51 |
| | $16,737.19 |

This assumes that all of the income available for spending was used to accumulate Items I, II and III since the amount of living and household expenses disbursed by the wife from funds drawn out of the State National Bank account (Item III) were not established in amount.

making the maximum of all community funds $16,737.19 turn into [4] $81,688.84.

The situation, of course, does call for the initial application of the presumption at least insofar as the stocks in Item I, the balance in Item II is due wholly or partly to payments made through the bank account (Item III). Dr. Duncan had several bank accounts, but it is undisputed that the Item III account was used for the deposit of all professional and personal income and earnings received by him whether of or from his separate estate or the community. It is equally admitted that expenditures for living and household expense were paid out of this account by periodic checks drawn on it and deposited to Mrs. Duncan's checking account in another bank. And, of great importance here, all deposits of cash in the Hutton account were made by checks drawn on this account, Item III.

While this does indeed raise a substantial burden, the Texas law, by word and action, recognizes that the presumption can be, and is here, overcome.

■ Texas law is emphatic, for "The presumption that property purchased during the marriage is community property is very cogent, and can only be repelled by clear and conclusive proof that it was with the individual money or property of one of the partners. Where the property has not been preserved in specie or in kind, but * * * has undergone mutations and changes, it is indispensable, to maintain its separate character, that it be clearly and indisputably traced and identified," Chapman v. Allen, 15 Tex. 278, 284. With equal emphasis, for property acquired during the marriage presumed to belong to the community, the burden of "proving that it is the separate property of either is on the party asserting it. * * * in order to show that property purchased during the marriage is the separate property of one of the spouses, the fund with which such property was acquired must be clearly shown to have been the separate property of such person * * *," Morris v. Hastings, 70 Tex. 26, 29, 7 S.W. 649, 651. Harkness v. McQueen, Tex. Civ.App., 232 S.W.2d 629, 633; Robb v. Robb, Tex.Civ.App., 41 S.W. 92, 95; Edelstein v. Brown, Tex.Civ.App., 95 S.W. 1126, 1130, affirmed 100 Tex. 403, 100 S.W. 129; Ervin v. Ervin, 60 Tex.Civ. App. 537, 128 S.W. 1139, writ of error dismissed; Thomas v. Thomas, Tex.Civ. App., 277 S.W. 210, 212, writ of error dismissed; Finley v. Pafford, Tex.Civ. App., 104 S.W.2d 163, 164, writ of error dismissed; Hardee v. Vincent, 136 Tex. 99, 147 S.W.2d 1072, 1073; Lindemood v. Evans, Tex.Civ.App., 166 S.W.2d 774, 775, writ of error refused; Walker-Smith Co. v. Coker, Tex.Civ.App., 176 S.W.2d 1002, 1007, error refused, want merit; Gibson v. Gibson, Tex.Civ.App., 202 S.W.2d 288, 289.

■ The act of mixing or commingling separate and community property may have a substantial effect upon the resulting property. For, "It is a well established rule * * * that where the husband or wife permits his or her separate property to become so commingled with community property that it cannot be identified, the separate property so commingled becomes community property * * *," Taylor v. Suloch Oil Co., Tex.Civ.App., 141 S.W.2d 657, 660,

---

4. Actually the cash outlay required would be more for the undisputed record shows that the Estate Return reported, and the Commissioner accepted, the following as community property:

| | |
|---|---|
| Checking account, El Paso National Bank in the names of Dr. or Mrs. E. A. Duncan | $ 4,828.19 |
| Checking account, Southwest National Bank in names of Mr. or Mrs. E. A. Duncan | 4,007.35 |
| 100 shares Sharp and Dohme | 2,500.00 |
| 300 shares Gleaner Harvester Corp. | 7,275.00 |
| | $18,610.54 |

writ of error dismissed, judgment correct; Edelstein v. Brown, Tex.Civ.App., supra. This is particularly true of commingled bank accounts since, "Generally speaking, it is the law that a bank account consisting of separate and community funds commingled in such a manner that neither can be distinguished from the other must be regarded as a community account," Smith v. Buss, 135 Tex. 566, 144 S.W.2d 529, 532; Phillips v. Vitemb, 5 Cir., 235 F.2d 11. Where the property goes through changes or is exchanged or sold and thus used in the acquisition of other property, the proof of origin of the funds must be "clear and conclusive," Love v. Robertson, 7 Tex. 6, 11, for it is " * * * a case in which it was necessary to trace the *means* through mutations and changes, * * * this should have been done 'clearly and indisputably' (Chapman v. Allen, 15 Tex. 278, 283). The *means* invested should have been traced back to the separate estate, not through indefinite channels and unknown changes, but connectedly and plainly," Schmeltz v. Garey, 49 Tex. 49, 61. (Emphasis supplied.)

■ The presumption, while strong, is yet a disputable one and subject to being rebutted if adequate proof is made. This recognized in reverse fashion for unless there is satisfactory proof " * * as to *how much* separate and *how much* community *funds* were used in the purchase of a stock * * * it cannot be determined that [there is] * * * any separate interest in them whatever * * *," Smith v. Bailey, 66 Tex. 553, 554, 1 S.W. 627, 628; Hardee v. Vincent, 136 Tex. 99, 147 S.W.2d 1072, 1074. "Applying these principles to the present case, we think the plaintiffs below should have shown, with greater certainty, *how much* of the proceeds of · her original stock was used in the purchase of the goods levied on. She should further have more clearly shown *how much* of these proceeds were her separate property, and *how much* were profits, or community estate of herself and husband," Epperson v. Jones, 65 Tex. 425, 429. "The * * * separate property may undergo changes

and yet retain its separate character; but, where * * * separate property has undergone mutations and changes, in order to hold it as * * * separate estate [the spouse] must then be able to trace and identify it in its changed condition, and, if it is not all shown to be her separate property, the wife, in order to protect it from her husband's creditors must be able to prove *how much* is separate and *how much* is community * *," Walker-Smith Co. v. Coker, supra; Schwethelm v. Schwethelm, Tex.Civ. App., 1 S.W.2d 911; Finley v. Pafford, supra.

And Phillips v. Vitemb, 5 Cir., 235 F.2d 11, reflects these principles. Where, as in Phillips v. Vitemb, supra, there was no showing of a maximum community fund beyond which, in *fact*, no community estate could exist, the acts of deposits and partial withdrawals were treated as a commingling and the withdrawals as presumptively community. But it was not there held or stated that the presumptive community character of withdrawals would continue when on satisfactory proof, it was demonstrated positively that there was absolutely no community funds, or proceeds, or income from which the so-called presumptive community interest could come.

And that is what was done here in several ways. First, the income tax returns of decedent, and for the years during marriage, his wife, as well, showed *all* of his and their earnings and receipts. And in the analysis which we make all of this is treated as belonging to the community. And this, even though a part of it was demonstrated on the face of the returns and other papers to be gains from proceeds of the sale of his premarital stocks, and there was no deduction for admittedly living expenses paid out of this fund and account and which are presumptively community disbursements. Barrington v. Barrington, Tex.Civ.App., 290 S.W.2d 297; Coggin v. Coggin, Tex.Civ.App., 204 S.W.2d 47, 54; Moore v. Moore, Tex.Civ.App., 192 S.W. 2d 929, 934. There was thus no other source whatever from which the "pre-

sumed" community contributions could come. The total of these could not possibly have exceeded $16,737.19, note 3, supra.

And with the proof establishing to a positive certainty the maximum community funds, there was equally overwhelming proof leaving nothing to surmise or speculation that the husband had substantial separate means which had been, were, and had to be used in these stock acquisitions.

The Estate, for example, starting with the last credit balance ($135.49) in the Hutton & Co. trading account (cash, none on margin) just prior to marriage seems to urge that it must be considered as starting then and there. But this ignores the absolute proof to the contrary. It was an exceedingly active account in which Dr. Duncan bought, sold and traded in many securities, selling many that he had inherited or earlier purchased, taking down the cash or reinvesting the proceeds in other stocks. For example, in the year of his marriage, 1946, beginning with the credit balance of $3,791.33 on January 1, 1946, he had by August 30, 1946, (when the balance was $135.49) sold stocks (many traced specifically from the estate of his first wife) producing sufficient proceeds to pay him by check $35,000 and purchased stock worth nearly $21,054.61. The extent of the trading in admittedly separate properties for this period totaled $52,127.79.

Nor was this all. From the estate of his first wife (who died September 12, 1945) he became the absolute owner of liquor properties valued at $57,980.92. In September of 1944, he had inherited $43,421.62 from his mother's estate. The decedent's income tax returns (note 3, supra) for 1946, 1947, 1948 show sales of stock with a cost basis of $18,519.56 acquired in the years 1919 to 1937 which were not a part of the community of Dr. Duncan and his first wife. And in the year of the second marriage, 1946, stock sales had produced a capital gain of $11,-725.06. These alone exceeded $130,000 in separate assets of a highly liquid character. That it was not squandered or dissipated during the second marriage is established by the Estate return which showed the value of separate stocks and bonds at $58,513.86 plus those here in question at $73,290.54, plus the bank accounts and two other stocks (note 4, supra) of $18,610.54 for a total of $150,-414.94.

The trading done each year in this stock account was likewise demonstrated to have far exceeded the limited maximum community means of $4,137.32, $6,024.26, $5,977.51 for the years 1947, 1948, 1949 (note 3, supra). In this period a total of $45,257.20 in cash deposits was made to the Hutton account. And for the same period stocks bought totaled $95,326.24 while those sold totaled $93,280.38. And, even more impressive, the sales of stock positively shown to have been owned prior to the second marriage, the proceeds [5] of which were withdrawn in cash or reinvested in the stock directly traced to those now claimed as community, alone totaled over $79,-490.42.

■ When facts demonstrate positively and conclusively that on the assumption that every cent of community funds was invested, it was but a fraction

---

5. Only the one withdrawal of cash ($35,-000), March 31, 1946, was ever made. Except for deposits of cash in the account to supplement proceeds of sales with which to purchase new stocks, the only other accounting items of any significance were: February 1949 transfer of $5,-557.77 to decedent's "short account"; April 30, 1949, transfer to "put-calls" $356.25; and November 30, 1949, transfer to or from "short account" $739.89. Dividends received on stock, admittedly community property, as found by the District Court, totaled $683.82. These were commingled in the account but were included in the maximum for each of the three years, note 3, supra. The account detail and income tax returns also established positively that no stocks acquired after October 28, 1946, the date of the second marriage, were sold in 1946, 1947, or 1948. During 1949, some of such stocks (cost basis $16,904.87) were sold for $14,820.64 at a loss of $2,084.23.

of the cost of the property thus acquired, the presumption no longer has any basis in fact, and indeed, flying in the face of facts, it is overcome. This is far different from the uncertain situations where the mere circumstance of the marriage of a wealthy husband and an impecunious wife followed by a general declining fortune after marriage has been held insufficient, in that form, to overcome the presumption. Schmeltz v. Garey, 49 Tex. 49; Rippy v. Rippy, Tex. Civ.App., 49 S.W.2d 494, writ of error refused; York v. Hilger, Tex.Civ.App., 84 S.W. 1117. For here, naught is left to speculation. If the very last penny of all possible community funds is accounted for and falls woefully short of being sufficient to pay for the property of the same kind in which the husband has been trading extensively prior to marriage and which is actually used as the substantial part of the purchase price of the newly acquired property, the presumption, in the face of that absolute showing, must fall. When it is demonstrated that it could not possibly (apart from contemporaneous gifts) have come from the community and, on the other hand, it is equally established that ample separate means were available and specifically employed, the "how much" requirement, Walker-Smith Co. v. Coker, Tex.Civ.App., 176 S.W.2d 1002, 1008, supra, has been adequately met.

But we do not think that this conclusion supports the full action which the District Court took in holding in effect that since *all* could not be presumed to be community, *all* must be considered to be the opposite—i. e., separate. This might follow were the presumption an ordinary one in which, controlling merely procedural aspects, once the presumption is out of the way, the matter stands as though one never existed with the burden on the party asserting the fact to establish it. But this has a significance transcending this and is itself a rule of property, McFaddin v. Commissioner, 5 Cir., 148 F.2d 570, Howard v. United States,

5 Cir., 125 F.2d 986, whose general purpose is to protect the community especially where, after passage of years, titles might be imperiled by the difficulty of obtaining proof or the equivocal nature of it concerning the fiscal business affairs of the community, husband or wife, long after the event. Consequently, to the maximum extent that community property was available for purchase, or the accumulation of property in question, it will take on that character, i. e., community, unless it can be shown with the positiveness indicated that it was the separate means of a spouse which was used.

When this is applied, we do not find evidence which demonstrates this with the certainty demanded under Texas law. The effect of this may be illustrated by several transactions and deposits of cash in the Hutton account. In February 1947, a deposit from the State National Bank account was made for $500. On familiar principles, this $500 was presumably community. Part of that went into the purchase of a stock which was treated by the Estate as separate, but at least $234.32 remained. This $234.32 went into the purchase price ($3584.68) for the first of the Item I stock (subitem 15) for 200 shares of Adams Express. As to this stock, the minimum community ownership would be 234/3584.

More graphic is the purchase October 21, 1947, of subitem (17), Groups Security Investment stock for $5,000.38. Just before this purchase, the credit balance from trading in decedent's premarriage separate property stocks (and the one deposit of $500 in cash) was $1,449.91. A deposit from the commingled bank account was made for $5,000. It was never shown what the bank balance was at the time of marriage or any other time except at the time of death (Item III $6,636.33, supra). But without more and positive facts, it is impossible as to this deposit or the stocks substantially

purchased with it, to say that neither it nor *any* part of it was community.[6]

Again, with a credit balance of zero as of January 1, 1948, which continued down to the time of the first purchases made May 28, 1948, for part of sub-items (15) Adams Express and (22) General American Investors totaling $8,105.59, a contemporaneous deposit for $8,106.94 was made. At least to the extent of that year's maximum community funds ($6,024.26, note 3, supra), the deposit from the commingled account was community unless, as cannot be done without the detail as to the gyrations of that bank account, the separate character of all or specific parts of that was established. Consequently, to that extent, at least, it is impossible to say that these stocks paid for by presumably community funds were not community.

In 1949, apparently because the credit balance on several of Hutton's monthly statements showed conflicting balances (e.g., $12,813.12 and $4,739.06; $12,456.-87 and $3,969.95; $11,714.46 and $3,969.-95), a deposit of $5,000 was made March 14, 1949. There was an actual credit balance then of $12,813.12 produced almost wholly by the sale in February of specific premarriage separate stocks. With the deposit, the total credit balance was then $17,813.12 which was used in March and April to purchase subitems (26) Keystone, (29) Selected Industries, and part of (30) Television Fund at a total cost of $7,241.58. Since there is no evidence except these figures, it is impossible to say that the presumptive community deposit of $5,000 was not used in the purchase of these stocks at least to the proportionate extent of the deposit (5000/17813 of $7,241.58) if not to the full extent of the deposit (5000/-7241). The next deposit in 1949 was for $6,000 August 2, which then made

the actual credit balance approximately $17,714.46 which was to purchase sub-item (24) General Motors for $6,221.09. At least to the extent of any remaining balance of "unused" community funds (maximum $5,977.51, note 3, supra), there is no way of demonstrating that such community funds did not go into that stock to give it, partially anyway, a community character.

■ As in these illustrations it is impossible to tell that the presumptive community deposits were not used, partially at least, for the payment of the purchase price of specific stocks, by the same token, it is impossible to state that, to the maximum extent of community funds, they did not go ratably into the purchase of all of these stocks. For example, in the illustrative transaction of 1948 above, a deposit of $8,106.94 was made. Subsequently, four more deposits were made totaling $11,617.26 for aggregate deposits of $19,722.85 for 1948. Since all we have is figures, it is impossible to determine to what extent the maximum community funds for 1948 ($6,024.26, note 3, supra) were used in the purchase of any one of these stocks. All might have been exhausted on the first purchase, or all might be ratably applied throughout the year. As this neither is nor can now be demonstrated, it does not overcome the presumption which the law affords to the community that, to this full extent, all was proportionately community property.

We need not determine what the position would be, or whether it would be affected by the circumstance of one claiming community rather than one claiming separate property, or vice versa, were the effort made to fix a full community ownership in specific pieces of property up to the point where the maximum community funds were exhausted for any

---

6. Assuming all of 1947 community funds were then available, one possibility would be:

| | |
|---|---|
| 1947 maximum community funds | $4,137.32 |
| Less presumed used on first purchase | 234.32 |
| | |
| Available for deposit Oct. 21, 1947 | $3,903.00 |

Community fraction would be: 3903/5000 of $5000.38

one or all of the three years. The parties here made battle on the comprehensive claim that *all* of these items I, II and III were community or separate. They were all related since the Estate's theory was that the bank account, Item III, was essential to mark the character of the cash deposits used in part for stock purchased, (Item I) and in determining the remaining credit balance (Item II).

With this approach, it is proper then for us to determine the community interest by applying the maximum community means to the whole of these three items. The proportionate interest will then be the ratio that the maximum,[7] $17,332.83, bears to the sum[8] of the cost of stocks in Item I plus Items II and III.

This treatment is, as it must be, entirely consistent with the Texas approach. For whether the concept is that of reimbursement[9] by the community for separate property used to pay for assets which become or are deemed community, Schmidt v. Huppman, 73 Tex. 112, 11 S.W. 175; Blumer v. Kallison, Tex.Civ. App., 297 S.W.2d 898; Sibley v. Sibley, Tex.Civ.App., 286 S.W.2d 657, writ of error dismissed; Hartman v. Hartman, Tex.Civ.App., 253 S.W.2d 480; Farrow v. Farrow, Tex.Civ.App., 238 S.W.2d 255; Hudspeth v. Hudspeth, Tex.Civ.App., 198 S.W.2d 768, writ of error refused, N.R. E.; Coggin v. Coggin, Tex.Civ.App., 204 S.W.2d 47; Thomas v. Thomas, Tex.Civ. App., 277 S.W. 210, writ of error dismissed; Norris v. Vaughan, 152 Tex. 491, 260 S.W.2d 676; Dakan v. Dakan, 125 Tex. 305, 83 S.W.2d 620; and see, The Community Property Law of Texas by W. O. Huie, Professor of Law, University of Texas School of Law, Vol. 13, Vernon's Civ.Stat. of Tex., p. VII et seq., §§ 3, 8, or is an apportionment between the two estates of actual ownership in the ratio that funds from each source were used, Gleich v. Bongio, 128 Tex. 606, 99 S.W.2d 881; Broussard v. Tian, Tex., 295 S.W.2d 405; Hartman v. Hartman, Tex.Civ.App., 253 S.W.2d 480; Moor v. Moor, 24 Tex.Civ.App. 150, 255 S.W. 231, where the maximum contribution is thus positively established, equitable principles will be recognized, Dakan v. Dakan, supra, to prevent a forfeiture of the separate estate, Hartman v. Hartman, supra; Farrow v. Farrow, supra; Barrington v. Barrington, Tex.Civ.App., 290 S.W.2d 297.

This result is in no way impeded, as claimed by the Estate, by the prior state court proceeding. We need not, under cases cited[10] by the Government, determine its sufficiency as an adversary suit, or the significance of such suits generally on Federal tax matters. For it was brought to construe the will to determine whether Dr. Duncan's devise of an absolute fee title to his widow of properties "* * * that may * * * stand in our joint names, or be vested in us jointly, whether as joint tenants * * * or as tenants in common * * *"

7. This figure of $17,332.83 is the total for 1947, 1948, 1949, note 3 supra, plus all ($1,193.74) of the net income from all sources for the whole of 1946 as though it were all community, rather than the apportionment of $598.10 on a two-months' basis as used by the Commissioner which made the total $16,737.-19.

8. Since the whole of all community funds is exhausted by this process, subitems (16) American Research and (20) Loomis-Sayles will be included even though not purchased through the Hutton account. But subitem (25) Hugoton, a stock dividend, for reasons pointed out infra, is clearly separate property and should be excluded altogether.

9. The Court of Civil Appeals' yearning, Moor v. Moor, 24 Tex.Civ.App. 150, 255 S.W. 231, 237, for simplicity in law seems to have gone unheeded: "Our law governing community and separate property is complicated enough as it is, and to ingraft upon it the principle [reimbursement] here contended for by appellant would bring about untold complications, the effect of which cannot be foreseen."

10. Saulsbury v. United States, 5 Cir., 199 F.2d 578, certiorari denied 345 U.S. 906, 73 S.Ct. 645, 97 L.Ed. 1342; Loggie v. Thomas, 5 Cir., 152 F.2d 636; Wolfsen v. Smyth, 9 Cir., 223 F.2d 111; Newman v. Commissioner, 9 Cir., 222 F.2d 131.

included community property. The Court, *so declaring*, decided that and nothing else. Whether particular assets involved (including Items I, II and III) were separate or community was not decided. To be sure, copies of the inventory and appraisal statements, as formal exhibits, did list the property in the two categories. But this had no significance other than showing what properties the Executors and Trustees considered would pass either to the surviving widow absolutely, or to her in trust for life with the remainder over depending upon the construction of the will. It did not seek to determine whether a particular asset should be as listed in the inventory or otherwise, and no evidence of the kind here involved was offered to show complete or partial payment of acquisition cost by either separate or community means.

■■■■■ As to subitem (25) Hugoton Product Co., this stock is clearly to be excluded from the pro rata community estate, note 8, supra. It was a stock dividend received during the second marriage on stock previously held. Dividends are, of course, community, but a stock dividend normally is that in name only. It is a mere rearrangement of the formal corporate bookkeeping structure with no increase in equity ownership, Hills, Accounting and Financial Statements (1957), § 4.3. In such circumstances, it is separate if the stock ownership out of which it springs is separate. Scofield v. Weiss, 5 Cir., 131 F.2d 631.

■■■ Finally, on the question of the small deduction as an apportionment of executor's and attorney's fees for probate proceedings and related matters as

between the total of decedent's interest in separate and community property, on the one hand, and the surviving widow's one-half interest in the community, the Estate on the trial had no benefit of presumptions of the kind which were of assistance in determining ownership. Whether the availability of the whole community for payment of community debts under Art. 3630, Vernon's Tex.Rev. Civ.Stat., brought both estates in for some character of beneficial administration so that the surviving widow's share of the community should bear a part of these charges, on the record as made, rested in part on facts and implied fact findings not shown to have been clearly erroneous, Fed.Rules Civ.Proc. rule 52 (a), 28 U.S.C.A.

The result is that the judgment appealed from is modified and the cause remanded to the District Court for recomputation of the refunds owing consistent with the principles here expressed.

Reversed and remanded.

On Petition for Rehearing

PER CURIAM.

The Petition for Rehearing is denied. But in view of the statement in the supporting brief,[1] we think it advisable to eliminate any doubt by emphasizing that the proportionate community-separate estate ownership in each of the subitems comprising Items I, II and III has been fixed by our opinion (see especially notes 7 and 8 and related text). On remand the only matter left open is ascertaining and computing the amount of refund now due in view of this limited modification of the judgment appealed from.

---

1. "Thus, the holding of this Court that the District Judge on remand should make an effort to allocate the bank account, brokerage account, and the stocks bought and paid for from such accounts pro rata to separate and community property, is in direct conflict with Texas law which says this shall not be done."