The CONNECTICUT BANK AND TRUST
COMPANY, Executor of the Estate of
Charles A. Hunter, Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 300, Docket 35122.

United States Court of Appeals,
Second Circuit.

Argued Feb. 11, 1971.

Decided March 11, 1971.

S. Michael Schatz, Hartford, Conn.
(Schatz & Schatz, Hartford, Conn., and
Stanford N. Goldman, Jr., Hartford,
Conn., of counsel), for plaintiff-appellee.

Stephen Schwarz, Atty., Tax Division,
Dept. of Justice, Washington, D. C.
(Johnnie M. Walters, Asst. Atty. Gen.,
Joseph M. Howard, Bennett N. Holland-
er and Meyer Rothwacks, Attys., Tax
Division, Dept. of Justice, Washington,
D. C., Stewart H. Jones, U. S. Atty., for
the District of Connecticut, and B. Blair
Crawford, Asst. U. S. Atty., Hartford,
Conn., of counsel), for defendant-appel-
lant.

Before WATERMAN and FRIEND-
LY, Circuit Judges, and McLEAN, Dis-
trict Judge.*

FRIENDLY, Circuit Judge:

The Government's appeal from a judg-
ment of the District Court of Connecti-
cut, 313 F.Supp. 479, in this refund case
involves some rather complex provisions
of the federal estate tax. Save for a
minor addition by way of explanation
in the margin,[1] we cannot improve upon

---

* Of the District Court for the Southern Dis-
trict of New York, sitting by designation.

1. The amount of the refund claimed was
$43,036. This was the difference between
$120,472, the tax liability on the 1962
return, and $77,436, the tax liability re-

calculated on the basis of the $130,929 in-
crease in the charitable residue resulting
from the refund of Connecticut taxes.

The 1962 taxable estate was $453,010.
The gross tax liability on this was
$130,663; this was reduced by the max-
imum allowable credit for state death

Judge Clarie's statement of the undisputed facts:

Charles A. Hunter died on April 23, 1961. His will, which was executed on April 27, 1956, established two trusts. The first testamentary trust, designated as the A Trust, consisted of the maximum marital deduction amount allowable. Hunter's widow was to receive all the income from this trust for life. In addition, she could obtain so much of the principal as she requested in writing up to a limit of $100,000. The trustee was authorized to invade the corpus when it considered such action proper "for her support in the manner to which she is accustomed." Finally, the widow was given a testamentary power of appointment over the A Trust corpus. In default of her exercise of this power, the remainder was to go into a trust herinafter described as the B Trust.

The terms of the B Trust provided that the widow was to receive the income for life and after the termination of her life estate, several specific bequests were to be made and the remainder was to be held in trust for several specified charitable beneficiaries. The will further provided that all taxes assessed against the estate were to be paid out of the B Trust.

The estate filed a federal estate tax return on July 20, 1962, and, save for a minor adjustment, assented to by the executor, it was accepted as filed. That original return claimed a charitable deduction for the remainder interest of the B Trust, equaling $698,761.90. In computing this deduction in Schedule N of the estate tax return, the executor started with the value of the gross estate and subtracted therefrom all moneys and properties which were or would be otherwise distributed. The Connecticut succession taxes paid and deducted under this procedure amounted to $151,519.75. The method of calculation pursuant to § 2055(c) of the Internal Revenue Code of 1954, limited the charitable deduction to the amount which would be actually available to the designated charitable beneficiaries. * * * The Connecticut succession tax deducted from the gross estate [for purposes of determining the charitable residue] in the federal estate tax return was paid in accordance with § 12–355, Conn.Gen.Stat. The state tax law provides that if it is impossible to compute the present value of any property to be transferred, the executor and the tax commissioner may enter into an agreement as to what the tax liability of the estate will be and such agreement will be binding on the par-

taxes, $10,520, to $120,143, and increased by a $329 deficiency assessment to the final figure of $120,472. The recalculated taxable estate was $304,361. The gross tax liability on this was $83,096; this was reduced by the maximum allowable credit for state death taxes (the Connecticut tax bill, after the refund, was about $20,000), $5,660, which produced the final figure of $77,436.

The methods of calculating the ultimate tax liability are quite complex in a case such as this in which the federal tax depends on the amount of the charitable deduction which in turn depends on the amount of the federal tax (less credit for state death taxes). This is what Mr. Justice Holmes meant when he referred to "the problems raised by two mutually dependent indeterminates," Edwards v. Slocum, 264 U.S. 61, 63, 44 S.Ct. 293, 68 L.Ed. 564 (1924), which the Govern-

ment, in that case, had offered to solve by an algebraic formula. The Internal Revenue Service in its Supplemental Instructions for Form 706 for Computation of Interrelated Death Taxes and Marital or Charitable Deduction offers a variety of methods involving successive approximations for determining the federal tax liability when there are two or more "mutually dependent indeterminates." An algebraic formula, cf. 4 Mertens, Law of Federal Gift and Estate Taxation § 30.15, pp. 687–89 (1959) (dealing with the comparable problem with respect to the marital deduction), may also be employed. "If any difficulty is experienced, a request for solution of the problem may be submitted * * * to the Commissioner of Internal Revenue." IRS, Supplemental Instructions for Form 706 for Computation of Interrelated Death Taxes and Marital or Charitable Deduction.

ties. If an agreement cannot be reached then, under § 12–355(b), the estate is to pay a tax based "upon the assumption that the contingencies will so resolve themselves as to lead to the highest tax possible under the provisions of this chapter." This latter procedure was followed by the Bank in the present case.

On March 4, 1966 Hunter's widow executed a release of her power of appointment over the remainder of the A Trust, as provided in the fifth paragraph, subparagraph C of said will. The Connecticut succession tax was then recomputed pursuant to § 12–355 (b), and said tax was reduced to $20,-590.73. The estate has been refunded the excess paid in the sum of $130,929.-03, and that amount has now gone into and been added to the charitable remainder of the B Trust.

Even though Mrs. Hunter did not release her power of appointment over the A Trust until March 4, 1966, the claim for refund of $43,036 was filed on July 16, 1965, in apparent anticipation of that event.[2] Upon the denial of the claim, the executor brought this action. It made no contention for refund under 26 U.S.C. § 2055(a) [3] based on the larger sums that will enure to charity as a direct result of Mrs. Hunter's relinquishment of her power of appointment over the corpus of the A Trust. This was for two rather obvious reasons: The entire amount of the A Trust had already been deducted under the marital deduction, 26 U.S.C. § 2056, and Mrs. Hunter's disclaimer was not made before

2. Since the return was filed on July 20, 1962, if the executor had waited four days longer, the three-year statute of limitations for filing of refunds would have run, § 6511(a), and the claim would have been limited to the amount of taxes, if any, paid in the two years prior to the filing of the claim, § 6511(b) (2) (B). The Government has not argued that the result should differ because Mrs. Hunter released the power of appointment nearly nine months after the filing of the refund claim rather than immediately prior thereto.

3. Section 2055(a) directs, *inter alia*, that "the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers (including the interest which falls into any such bequest, legacy, devise, or transfer as a result of an irrevocable disclaimer of a bequest, legacy, devise, transfer, or power, if the disclaimer is made before the date prescribed for the filing of the estate tax return)" to or for the use of "any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes" etc. Section 2055(b) (2), which has all the earmarks of special legislation, adds:

(2) *Special rule for certain bequests subject to power of appointment.*—For purposes of this section, in the case of a bequest in trust, if the surviving spouse of the decedent is entitled for life to all of the net income from the trust and such surviving spouse has a power of appointment over the corpus of such trust exercisable by will in favor of, among others, organizations described in subsection (a) (2), such bequest in trust, reduced by the value of the life estate, shall, to the extent such power is exercised in favor of such organizations, be deemed a transfer to such organizations by the decedent if—

(A) no part of the corpus of such trust is distributed to a beneficiary during the life of the surviving spouse;

(B) such surviving spouse was over 80 years of age at the date of the decedent's death;

(C) such surviving spouse by affidavit executed within one year after the death of the decedent specifies the organizations described in subsection (a) (2) in favor of which he intends to exercise the power of appointment and indicates the amount or proportion each such organization is to receive; and

(D) the power of appointment is exercised in favor of such organizations and in the amounts or proportions specified in the affidavit required under subparagraph (C).

The affidavit referred to in subparagraph (C) shall be attached to the estate tax return of the decedent and shall constitute a sufficient basis for the allowance of the deduction under this paragraph in the first instance subject to a later disallowance of the deduction if the conditions herein specified are not complied with.

**934**

the date prescribed for the filing of the estate tax return, 26 U.S.C. § 2055(a). The executor's reliance, which the district court sustained, was rather on a literal reading of 26 U.S.C. § 2055(c):[4]

> (c) *Death taxes payable out of bequests.*—If the tax imposed by section 2001, or any estate, succession, legacy, or inheritance taxes, are, either by the terms of the will, by the law of the jurisdiction under which the estate is administered, or by the law of the jurisdiction imposing the particular tax, payable in whole or in part out of the bequests, legacies, or devises otherwise deductible under this section, then the amount deductible under this section shall be the amount of such bequests, legacies, or devises reduced by the amount of such taxes.

The argument was that the refund of Connecticut inheritance taxes paid out of the residue of Trust B would increase the amount going to charity, that this would reduce the federal estate tax that had also been paid therefrom and thereby further increase the charitable deduction, and that the combination of these factors would reduce federal estate tax liability from $120,472.25 to $77,436.00. See fn. 1 *supra.* The Commissioner does not contest the computations; his objections go to the theory.

Section 2055(c), whose ancestry goes back to the Revenue Act of 1924, 43 Stat. 307,[5] was a legislative response to Edwards v. Slocum, 264 U.S. 61, 44 S.Ct. 293 (1924), which held as a matter of statutory construction that the deduction for a residuary bequest to charity was not to be reduced by taxes payable out of the residue. The Senate Report, S. Rep.No.398, 68th Cong., 1st Sess. (1924), 1939–1 Cum.Bull. (Part 2) 266, 290, issued two months after the decision, said:

> A sentence has been inserted  *  *  * to make it clear that the amount deductible under these paragraphs on account of bequests, legacies, or devises for the specified benevolent purposes shall be the net amount distributable for such purposes after estate, legacy, or inheritance taxes imposed in respect thereof have been deducted therefrom. It is evident that if a testator leaves a residuary estate of $1,000,000 to a charity, but the estate taxes payable out of the residue reduce the amount actually distributed to the charity to $950,000, only the latter amount should be deductible, in computing the amount of the net estate, as a bequest to charity. This sentence so provides.[6]

<hr>

4. Since the plaintiff's claim for a refund is predicated on the argument that the reduction in the charitable deduction required by § 2055(c) must be recomputed on the basis of events occurring subsequent to the determination in the estate tax return, we are unable to understand its contention that the Government is somehow prevented from arguing that the district court misapplied that subsection. Indeed, it was plaintiff's counsel who made unmistakable—though not explicit—reference to the provision in oral argument before the district court:

> In other words, Trust B, as the residuary trust, is computed by taking your gross estate and deducting therefrom your various deductions:  *  *  * you come down now to a net amount which is further depleted by the amount of tax you pay the State of Connecticut and by the amount of tax that you pay the Federal Government.

The failure of the Government to emphasize the provision below was apparently due to its assumption that if the taxpayer could not bring itself within the specific relief provisions of § 2055(a) or (b) (2), the original determination under § 2055(c) must necessarily stand.

5. The subsection was retroactively repealed by the Revenue Act of 1926, 44 Stat. 86, see S.Rep.No.52, 69th Cong., 1st Sess. (1926), 1939–1 Cum.Bull. (Part 2) 332, 338–39, but was restored in 1932, 47 Stat. 282, see H.R.Rep.No.708, 72d Cong., 1st Sess. (1932), 1939–1 Cum.Bull. (Part 2) 457, 492–93; S.Rep.No.665, 72d Cong., 1st Sess. (1932), 1939–1 Cum.Bull. (Part 2) 496, 534.

6. The reports on the restoration of the provision in 1932, cited in the preceding footnote, were to the same effect.

See also Harrison v. Northern Trust Co., 317 U.S. 476, 479–481, 63 S.Ct. 361, 87 L.Ed. 407 (1943).

Although Congress overruled Edwards v. Slocum in this respect, it manifested no general disagreement with Mr. Justice Holmes' characterization of the estate tax as a tax on the *transfer* of the net estate which "comes into existence before and is independent of the receipt of the property by the legatee" and "manifestly assumes that the net estate will be ascertained before the tax is computed." 264 U.S. at 62–63, 44 S.Ct. at 293. A few years later he took occasion to apply these views in a strong decision. In Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L. Ed. 647 (1929), a testator had bequeathed his estate in trust for his wife for life, with the remainder to charities. Although the wife had died within the year granted by the statute for filing the estate tax return, the Court held that the deduction for the charitable bequest must be reduced by the value of the wife's life estate as determined by "mortality tables showing the probabilities as they stood on the day when the testator died," 279 U.S. at 155, 49 S.Ct. at 291. The amount of the charitable deduction was to be determined by the market value of the remainder interest at the testator's death. Statistical tables would have determined this for testators in general; it did not matter that such tables would have been inaccurate in the particular case.

Although, as recently stated in Estate of Lion v. C.I.R., 438 F.2d 56 (4 Cir., 1971), decisions of the Tax Court there cited have departed "from strict application of actuarial tables where there is reasonable certainty [at the date of death] that use of the tables would violate reason and fact," neither those decisions nor *Lion* can assist the plaintiff. The principle which controls decision here is that "[i]f, as of the date of the decedent's death, a transfer for charita-

ble purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible." I.R.C. Reg. § 20.2055–2(b); C.I.R. v. Estate of Sternberger, 348 U.S. 187, 199, 75 S.Ct. 229, 99 L.Ed. 246 (1955). Here there was no assurance that Mrs. Hunter would release her power of appointment over the A Trust, thereby effecting the refund of some $131,000 in Connecticut death taxes previously paid out of the B Trust. To permit the taxpayer to prevail in the instant case would ignore the very palpable possibility that the B Trust would remain as Mr. Hunter had left it. The general language of § 2055(c) must therefore be read in accordance with these settled principles of federal estate tax law.

The rigors of the date of death rule were somewhat tempered in 1942 when Congress inserted the parenthetical clause in § 2055(a), see fn. 3, effective retroactively to February 10, 1939, 56 Stat. 949,[7] and by § 2055(b) (2), added in 1956, 70 Stat. 1075, effective August 16, 1954. The Government does not dispute that if Mrs. Hunter had made an irrevocable disclaimer of her power of appointment before the date prescribed for filing the estate tax return, the amount of Connecticut taxes deductible from the charitable bequest would have been correspondingly reduced, with an appropriate reduction in the deduction therefrom for federal estate tax, and the resulting decrease in federal estate tax for which the executor here contends. However, Mrs. Hunter postponed her decision for several years thereafter.

Our conclusion adverse to the taxpayer finds support in what seems the only closely comparable case, Estate of Brooks v. C.I.R., 250 F.2d 937 (3 Cir. 1958), although that decision does not go quite so far. Colonel Brooks left a

---

7. For the legislative history see H.R.Rep. No.2333, 77th Cong., 2d Sess. 166–67 (1942); S.Rep.No.1631, 77th Cong., 2d Sess. 240 (1942).

will which provided for two trusts: Trust A, a marital deduction trust, and Trust B, the income from which was to be paid to charities apparently qualifying for deduction under federal but not under Pennsylvania law. All estate and inheritance taxes were payable out of Trust B. Mrs. Brooks had power to withdraw principal from Trust A and a general testamentary power of appointment, in default of the exercise of which the principal would fall into Trust B. The Commissioner took the position, sustained by the Tax Court, that the charitable deduction should be reduced to reflect not only the Pennsylvania inheritance taxes that had already been paid, as the estate agreed, but also its contingent liability for additional such taxes because of the possibility that Mrs. Brooks would neither withdraw principal from Trust A nor exercise her general power of appointment in a manner that would avoid additional Pennsylvania taxes payable out of Trust B when Trust A terminated.[8] The court, in an opinion by Judge Goodrich, upheld the Commissioner. In language that is peculiarly appropriate to the instant case he stated that "at the critical dates [the date of death or one year thereafter] no one could tell for a certainty or even with reasonable probability what the course of devolution of the corpus of Trust A would be," 250 F.2d at 939, and that "[t]he previous cases teach that if there is a possibility that not all of the claimed deduction will eventually go to charity, '* * * the taxpayer has the burden of establishing that the amounts which will * * * reach the charity are thus accurately calculable' [citing Merchants Nat'l Bank v. C.I.R., 320 U.S. 256, 261, 64 S.Ct. 108, 88 L.Ed. 35]." *Id.* The only difference we perceive between our case and *Brooks* is that we know what Mrs. Hunter has done whereas the Third Circuit did not know what Mrs. Brooks would do and declined, on the basis of sound authority, to speculate on the possibilities. While that difference might appear to be a fact of some significance, such a conclusion would, in Mr. Justice Holmes' phrase, be "due to inaccurate thinking." Ithaca Trust Co. v. United States, *supra*, 279 U.S. at 155, 49 S.Ct. 291. For the cases are alike in that uncertainty concerning the widow's action existed "at the critical dates," and the rationale of *Brooks* thus indicates reversal here.

We could end the opinion at this point except for the possible inferential bearing of a provision of the estate tax law not relied upon by the executor and consequently not discussed by the Government. Section 2011(a) allows a limited credit for estate, inheritance, legacy or succession taxes "actually paid" to any state, and § 2011(c) says that, subject to certain exceptions, this credit "shall include only such taxes as were actually paid and credit therefor claimed within 4 years after the filing of the return * * *."[9] On the basis of this section, the executor might argue that when Congress wished to put a time limit on the effect of a recomputation of state

8. Apparently the only charitable institution in the entire Commonwealth that would then have been exempt from Pennsylvania inheritance taxes was the Western Pennsylvania Historical Society. This was not one of the objects of Colonel Brooks' bounty, and there was no evidence that Mrs. Brooks was interested in it when his will became effective.

9. The credit for state taxes first came into the federal estate tax in the Revenue Act of 1924, 43 Stat. 304. The Revenue Act of 1926, 44 Stat. 70, which significantly increased the maximum allowable credit, also introduced the "actually paid" language into the provision. The House Report, H.R.Rep.No.1, 69th Cong., 1st Sess. (1925), 1939–1 Cum.Bull. (Part 2) 315, 325 stated:

> A further amendment is made to this provision of existing law to the effect that the credit shall include only such taxes as were actually paid and credit therefor claimed within four years after the filing of the return. So much of a State inheritance or other such tax as is paid but subsequently, within such four years, refunded, is not, of course, "paid" within the meaning of this provision.

Although the bill, as Congress finally enacted it, limited the period within which a credit could be claimed to three years

death taxes, it did so in express terms. But the Government would doubtless answer that the provision indicates that Congress knew how to be explicit when, as an exception to the general rule, it meant to allow estate tax liability to be varied by post-death events rather than on probabilities existing at the date of death, or, alternatively, that the provision was simply intended to insure against the grant of a credit for sums that did not reach a state's coffers within a measurably short time after death and affords no help in construing other sections of the estate tax. The balance on this inconclusive exchange does not tip so decisively in favor of the executor —if it tips that way at all—as to lead us to alter the conclusion we would reach apart from it. We come back to Mr. Justice Holmes' point. When the estate tax return was filed, one could do little more than speculate whether Mrs. Hunter would release her general testamentary power sometime in the future. If she wished the estate to have an increased deduction by the tax savings accruing from a larger charitable deduction, she needed only to comply with the parenthetical clause of § 2055(a). It would be unreasonable to read the statute so that her noncompliance had the same effect.

The judgment is reversed with instructions to dismiss the complaint.

rather than the four suggested above by the House Committee, 44 Stat. 70, the four-year provision was adopted in 1932. 47 Stat. 279.