The ESTATE OF Mary Frances Smith BRIGHT, Deceased, by H. R. Bright, Independent Executor, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

No. 78–2221.

United States Court of Appeals, Fifth Circuit.*

Oct. 1, 1981.

M. Carr Ferguson, Asst. Atty. Gen., Philip I. Brennan, Richard W. Perkins, Gilbert E. Andrews, Act. Chief, Ernest J. Brown, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant-appellant.

Thompson, Knight, Simmons & Bullion, J. W. Bullion, Emily A. Parker, Payne & Spradley, Robert B. Payne, Dallas, Tex., for plaintiff-appellee.

Robert Edwin Davis, Rodney J. Owens, Dallas, Tex., Graves, Dougherty, Hearon & Moody, J. Chrys Dougherty, Austin, Tex., J. Lyndell Kirkley, Fort Worth, Tex., B. Hunter Loftin, Carl G. Mueller, Jr., Marvin K. Collie, Houston, Tex., J. David Tracy, Fort Worth, Tex., Vester T. Hughes, Jr., Dallas, Tex., C. W. Wellen, Fulbright & Jaworski, Houston, Tex., for amicus curiae.

Before GODBOLD, Chief Judge, BROWN, AINSWORTH, CHARLES

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

CLARK, RONEY, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, JR., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, and THOMAS A. CLARK, Circuit Judges.**

R. LANIER ANDERSON, III, Circuit Judge:

This case presents to the en banc court an important question involving the principles of federal estate tax valuation. Mary Frances Smith Bright died on April 3, 1971. During her lifetime, she and her husband, Mr. Bright, owned 55% of the common stock of East Texas Motor Freight Lines, Inc., 55% of the common stock of twenty-seven affiliated corporations, and 55% of the common and preferred stock of Southern Trust and Mortgage Company (the stock of all such corporations is hereinafter referred to collectively as the "stock").

During her lifetime, Mr. and Mrs. Bright held the 55% block of stock as their community property under the laws of the State of Texas. The remaining forty-five percent is owned by parties unrelated to the Brights; a thirty percent block of stock is owned by H. G. Schiff, and the remaining fifteen percent is owned by two or three other individuals. None of the stock was publicly traded and no market existed for any of the stock on the date of Mrs. Bright's death. Mr. Bright is executor under the will of his wife. The will devised Mrs. Bright's interest in the stock to Mr. Bright as trustee of a trust for the primary benefit of Mrs. Bright's four children.

After audit of the estate tax return, the government assessed a deficiency, which was paid by the estate, and the instant suit for a refund of over $3 million in federal estate taxes and assessed interest was brought in the district court. The sole issue before the district court was the value of the estate's stock. Before the bench trial on the fair market value issue, the district judge ruled as a matter of law that "no element of control can be attributed to the decedent in determining the value of the decedent's interest in the stock ... for estate tax purposes. The parties are hereby ordered to proceed with preparation for trial and trial of this case on that basis." At the trial the district court found that the value of the stock was consistent with the testimony of the estate's expert witnesses, and entered judgment for the estate. The government filed a timely notice of appeal. A panel of this court vacated the judgment of the district court and remanded with instructions, holding that the district court erred in entering the pretrial order relating to the element of control. 619 F.2d 407 (June 18, 1980). The estate's petition for rehearing en banc was granted, and the panel opinion was vacated. 628 F.2d 307 (Oct. 2, 1980). We now affirm the judgment of the district court.

The only issue facing the en banc court is whether the district court erred in entering the above-quoted pretrial order relating to the element of control. We reject the heart of the government's arguments, and also reject a secondary government argument because it was raised for the first time on appeal.

Two principal arguments constitute the heart of the government's case, the first based on its description of the property transferred as an undivided one-half interest in the control block of 55% of the stock, and the second based on family attribution between the estate's stock interest and the stock interest held individually by Mr. Bright.[1]

---

** Judge James P. Coleman elected not to participate in the consideration or decision of this appeal. Judges Thomas G. Gee and Jerre S. Williams recused themselves and did not participate in the consideration or decision of this appeal.

1. The government also argued in the court below, and argues on appeal, that the district court's pretrial order held as a matter of law that a minority discount should be applied. The government argues that a minority discount should be allowed only if evidence supporting a discount is adduced. We do not disagree with the government's statement of the law, but we reject the government's characterization of the district court's pretrial order. The order did not mandate a minority discount;

First, the government argues that the property to be valued for estate tax purposes is an undivided one-half interest in the control block of 55% of the stock, and that the proper method of valuation would be to value the 55% control block, including a control premium, and then take one-half thereof. Both parties agree that the estate tax is an excise tax on the transfer of property at death, and that the property to be valued is the property which is actually transferred, as contrasted with the interest held by the decedent before death or the interest held by the legatee after death. *United States v. Land*, 303 F.2d 170 (5th Cir. 1962). *See also Ithaca Trust Co. v. United States*, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929); *Edwards v. Slocum*, 264 U.S. 61, 44 S.Ct. 293, 68 L.Ed. 564 (1924); *Connecticut Bank and Trust Company v. United States*, 439 F.2d 931 (2nd Cir. 1971); *Walter v. United States*, 341 F.2d 182 (6th Cir. 1965); *Commissioner v. Chase Manhattan Bank*, 259 F.2d 231 (5th Cir. 1958). Both also agree that state law, Texas in this case, determines precisely what property is transferred. *Morgan v. Commissioner*, 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585 (1940); *Duncan v. United States*, 247 F.2d 845 (5th Cir. 1957). Both parties agree that, under Texas law, the stock at issue was the community property of Mr. and Mrs. Bright during her life, that Mrs. Bright's death dissolved the community, that upon death the community is divided equally, that each spouse can exercise testamentary disposition over only his or her own half of the community, and that "only the decedent's half is includable in his gross estate for federal tax purposes." *Commissioner v. Chase Manhattan Bank*, 259 F.2d at 239.

Under Texas law, upon the division of the community at death, each spouse owns an undivided one-half interest in each item of community property. *Caddell v. Lufkin Land & Lumber Co.*, 255 S.W. 397 (Tex. Com.App., 1923).

In its brief the government argued that, because the interest to be valued was an undivided one-half interest in the full 55% control block, the proper method would be to value the whole, including its control premium, and then take one-half thereof to establish the value of the estate's undivided one-half interest. The estate points out that the government's argument overlooks the fact that the block of stock is subject to the right of partition under Texas law at the instance of either the surviving spouse or the estate of the deceased's spouse. Tex. Prob.Code Ann. § 385 (Vernon 1980). The government has not argued that partition would not be freely granted in a case involving fungible shares, such as this case. Thus, the estate has no means to prevent the conversion of its interest into shares representing a 27½% block, and we conclude that the estate's interest is the equivalent of a 27½% block of the stock. Accordingly, we reject the government's approach of valuing the 55% control block, with its control premium, and then taking one-half thereof. *Accord Estate of Lee v. Commissioner*, 69 T.C. 860 (1978).

Having determined that the property which is to be valued for estate tax purposes is the 27½% block of stock owned by the estate, we turn to the government's second argument, which is based on the doctrine of family attribution[2] between the successive holders of interest to be taxed,

it held only that the interest to be valued was in fact a 27½% interest, which of course left open for proof at trial whether or not the taxpayer would in fact adduce proof to support a minority discount. Accordingly, there is no merit in the government's argument.

2. At several points, the government's brief seems to disavow any attempt to import family attribution into this area. A close reading of the government's brief reveals, however, that the government shuns only the argument that family attribution *requires* or *mandates* that the stock of related parties be valued as a unit. The government's position is that the relationship between the decedent, executor or legatee, on the one hand, and another stockholder, on the other hand, is a fact relevant to value. When we refer in this opinion to family attribution, we refer to this non-mandatory version. Similarly, our opinion deals only with family attribution based on the identity of the decedent, the executor or the legatee. It is this identity which is irrelevant under the case law and reasoning which this opinion will develop.

the decedent, the executor, and the legatee, on the one hand, and the related party, Mr. Bright, on the other. The government argues that the following facts are relevant and should have been considered by the district court in valuing the 27½% block: the fact that Mr. and Mrs. Bright were husband and wife and held their stock during her lifetime as a control block of 55%; the fact that Mr. Bright held the estate's 27½% block after her death as executor and subsequently as trustee of the testamentary trust for their children, while he simultaneously held another 27½% block in his individual capacity, thus continuing the control block after death; and the fact that the government might be able to adduce evidence that Mr. Bright, as executor or trustee, would not be willing to sell the estate's 27½% block as a minority interest, but would be willing to sell it only as part of the block of 55% including his individually-owned stock so that a sustantial control premium could be realized.[3] Such facts and evidence, the government argues, would have formed the basis of expert testimony that the value of the estate's stock includes some control premium. For several reasons, we reject the government's attempt to import into this area of the estate tax law this kind of family attribution, and we hold that the foregoing evidence proffered by the government is not admissible to prove the value of the stock at issue.

First, we reject any family attribution to the estate's stock because established case law requires this result. A recent case directly in point is *Estate of Lee v. Commissioner, supra.* There Mr. and Mrs. Lee held as community property 4,000 of the 5,000 outstanding shares of the common stock of a closely held corporation. They also held all 50,000 shares of the preferred stock. Upon the death of Mrs. Lee, the community was dissolved, leaving Mr. Lee and the estate of Mrs. Lee each with an undivided one-half interest in each item of the community property. 69 T.C. at 873. The Tax Court held that this was the equivalent of 2,000 shares of common stock and 25,000 shares of preferred stock, and that the estate's interest was a minority interest. 69 T.C. at 874.

In *United States v. Land, supra,* this court held that a restrictive agreement, which depressed the value of a partnership interest but which by its terms expired at decedent's death, did not affect value for estate tax purposes because the estate tax is an excise tax on the transfer of property at death and accordingly valuation is to be made at the time of the transfer, i. e., at death, and the valuation is to be measured by the interest that actually passes. 303 F.2d at 172. It follows necessarily from our *Land* holding that the fact that Mr. and Mrs. Bright held their stock during her lifetime as a control block of 55% is an irrelevant fact. It is a fact which antedates her death, and no longer exists at the time of her death. Dictum in *Land* also suggests that the post-death fact—that the estate's 27½% will pass to Mr. Bright as trustee of the testamentary trust—is also irrelevant:

> Brief as is the instant of death, the court must pinpoint its valuation at this instant—the moment of truth, when the ownership of the decedent ends and the ownership of the successors begins. It is a fallacy there, therefore, to argue value before—or—after death on the notion that valuation must be determined by the value either of the *interest that ceases or of the interest that begins.* Instead, the valuation is determined by the interest that passes, and the value of the interest before or after death is pertinent only as it serves to indicate the value at death.

303 F.2d at 172. (Emphasis added.)

Beginning at least as early as 1940, the Tax Court has uniformly valued a decedent's stock for estate tax purposes as a

---

**3.** This opinion will show that all three facts are irrelevant to the proper valuation formula because they depend upon the family relationship between the decedent, the executor or the legatee, on the one hand, and another stockholder, i. e., Mr. Bright in his capacity as an individual stockholder, on the other hand. The third factor is inadmissible also because it assumes an unwillingness to sell in direct contradiction to the established valuation formula which assumes a *willing* seller.

minority interest when the decedent him-self owned less than 50%, and despite the fact that control of the corporation was within the decedent's family. *Mathilde B. Hooper v. Commissioner,* 41 B.T.A. 114 (1940), *acq. on valuation issue* 1940–1 C.B. 3; *Estate of Gregg Maxcy,* 38 T.C.M. (P–H) ¶ 69,158 (1969), *reversed on other grounds,* 441 F.2d 192 (5th Cir. 1971); *Estate of Harry Leyman,* 40 T.C. 100, 119 (1963), *acq.* 1967–1 C.B. 2; *Estate of Irene de Guebriant,* 14 T.C. 611 (1950), *reversed on other grounds* 186 F.2d 307 (2nd Cir. 1951); *Estate of Ernest E. Kirkpatrick,* 44 T.C.M. (P–H) ¶ 75,344 (1975); *Estate of Alvin Thalheimer,* 43 T.C.M. (P–H) ¶ 74,203 (1974), *aff'd as to issue in question,* 532 F.2d 751 (4th Cir. 1976); *Estate of Sidney L. Katz,* 37 T.C.M. (P–H) ¶ 68,171 (1968); *Estate of Stoddard,* 44 T.C.M. (P–H) ¶ 75,207 (1975); *Estate of Louis Zaiger,* 64 T.C. 927 (1975), *acq.* 1976–1 C.B. 1. Similarly, many district courts have either expressly or impliedly rejected the application of family attribution to an estate's stock in the valuation process for estate tax purposes. *Obermer v. United States,* 238 F.Supp. 29 (D.Haw.1964); *Sundquist v. United States,* 74–2 U.S.T.C. ¶ 13,035, 34 AFTR2d 74–6337 (E.D.Washington 1974). Our research has uncovered no cases, and the government has cited none, which have attributed family owned stock to the estate's stock in determining the value thereof for estate tax purposes.[4]

Although the cases in the analogous gift tax area do not unanimously support the taxpayer's position, the weight of authority seems to reject family attribution in this context. In *Estate of Charles W. Heppenstall,* 18 T.C.M. (P–H) ¶ 49,034 (1949), the donor owned 2310 shares, which represented more than 50% and, therefore, control of the stock of the family corporation. He made gifts of 300 shares each to his wife and three children. The government argued that the shares given should be valued as control stock. The Tax Court rejected this argument, saying, "In making the gifts, Charles W. Heppenstall, Sr. did lose, or surrender, his control over the Company, but he did not convey that control to any one of the donees or to all of them jointly." The court cited *Mathilde B. Hooper v. Commissioner, supra,* an estate tax valuation case which applied a minority discount in valuing the decedent's stock notwithstanding the fact that the decedent's stock together with that of his brother would have created a control block. In holding that each 300 share gift must be valued separately, the *Heppenstall* court relied on *Lawrence C. Phipps,* 43 B.T.A. 1010 (1940), *affirmed* 127 F.2d 214 (10th Cir. 1942), a blockage discount case where the government was making the argument on the other side of the fence. In *Phipps,* the government argued that gifts to several

---

4. The government relies on three district court cases which apply a "unity of ownership for disposal" theory in the context of undivided interests in real property. *Cutbirth v. United States,* 38 AFTR2d 6271 (N.D.Tex.1976); *Dattel v. United States,* 37 AFTR2d 1525 (N.D.Miss. 1975); *Blackburn v. United States,* 6 AFTR2d 6146 (S.D.Ind.1960). Such cases are distinguishable because real estate, unlike fungible shares of stock, is not freely subject to partition. For example, see Texas Probate Code § 381(a) and (b) which provides in pertinent part: "When, in the opinion of the court, the whole or any portion of an estate is not capable of a fair and equal partition and distribution . . . it shall order a sale of all property which it has found not to be capable of such division." This point was made by the *Dattel* court: "In other words, a person owning an undivided half interest in a property is not entitled to one-half of the acreage." 37 AFTR2d at 76–1527. By contrast, in the instant case, the government

has not disputed that a partition is freely available, and accordingly we have held that the estate's interest is the equivalent of a 27½% block of stock. This being so, the only remaining factor in the instant case which might suggest a "unity of ownership for disposal" is the family relationship between the decedent, executor or legatee, on the one hand, and another stockholder, on the other hand. For the reasons set out in this opinion, we reject the application of family attribution in this context. Of the three cases cited by the government, only one, *Cutbirth,* 38 AFTR2d at 76–6273, suggests that a family relationship can be a factor pointing to "unity of ownership for disposal purposes." The suggestion occurs in a jury charge, and does not discuss the case law or legal principles which, we believe, demonstrate the impropriety of family attribution in this context. Thus, we accord little weight to this suggestion in *Cutbirth.*

family members should *not* be aggregated, while the taxpayer argued for aggregation in order to create a block of stock large enough to obtain a blockage discount. The Board of Tax Appeals held that the gift to each donee should be valued separately and that there should be no aggregation. *Accord Rushton v. Commissioner*, 498 F.2d 88 (5th Cir. 1974).

In *Whittemore v. Fitzpatrick*, 127 F.Supp. 710 (D.Conn.1954), the donor owned all 820 shares of the family corporation. He made simultaneous gifts of 200 shares to each of three sons. The government argued that the entire 600 shares of stock given should be valued as a control block. Holding that the gift to each son must be valued separately, the court applied a minority discount. Although there was no discussion of whether the stock of the father and the three sons should be lumped together because of family attribution, the court implicitly rejected that concept.[5]

An early case which might have been cited by the government is *H. Smith Richardson*, 17 T.C.M. (P–H) ¶ 43,496 (1943), *affirmed* 151 F.2d 102 (2nd Cir. 1945). The issue there was the proper value for gift tax purposes of 5100 shares of the stock of a family holding corporation given by the donor to his four children. The corporation was controlled by the donor, his brother, and the wives and family of each. The corporation was merely a holding corporation owning readily marketable securities. The Tax Court rejected the taxpayer's valuation which was based in part on application of a minority discount, and said that the only practical way to value the stock of such a family holding corporation was to primarily consider the underlying marketable securities owned by the holding corporation. Based on all the facts, the court found the fair market value of the shares given to be very close to the pro rata value of the underlying marketable securities. On appeal, although the Second Circuit affirmed the ultimate finding of approximately $95 per share, the court expressly labeled the interest to be valued as a minority interest, and expressly disapproved, as a departure from the fair market value test set out in the regulations, the Tax Court's language suggesting that primary consideration should be given to the value of the underlying marketable securities. Thus, the language of the Tax Court opinion which might have provided some support for the application of family attribution, in the context of the valuation of stock of a family holding corporation, was rejected on appeal. We have also seen that the Tax Court, in later opinions, has refused to apply family attribution to an estate's stock in estate tax valuation cases, or to each separate donee in gift tax valuation cases.

The government does rely on *Blanchard v. United States*, 291 F.Supp. 348 (S.D.Iowa 1968). There the donor owned 458 shares of a bank. A total of 2,000 shares were outstanding. The donor and her immediate family owned 1,048 shares, comprising a 52.4% block. Beginning in early 1959, the donor's son represented the family in negotiations to sell their controlling block of stock. In September or October all of the family owners had "agreed to sell control of the bank if satisfactory terms could be worked out. In October or November . . . [the Blanchards and the executive vice president of the purchaser] came to a general understanding as to the value of the Blanchard stock." 291 F.Supp. at 351. Although the purchaser's vice president had to secure approval from his Board of Directors, and although the Blanchards could not be absolutely certain of a sale, the court found that "one could conclude that . . . the donor . . . expected to sell the bank stock and knew that the gifted stock was worth over $700 per share on December 10, 1959." 291 F.Supp. at 351. On December 10, 1959, donor gave her 458 shares to her six grandchildren. On December 31, 1959, the sale was consummated at $707.45 per share; the

---

5. Other gift tax cases in which a minority discount was allowed for gifts of stock in a family controlled corporation are: *Koffler v. Commissioner*, 47 T.C.M. (P–H) ¶ 78,159 (1978); *Meijer v. Commissioner*, 48 T.C.M. (P–H) ¶ 79,344 (1979); *W. G. Clark v. United States*, 75–1 U.S.T.C. ¶ 13,076, 36 AFTR2d 75–6417 (E.D.N. C.1975).

stock which had been transferred to the six grandchildren just three weeks before was sold at that price along with the balance of the family's control block. The court expressly noted that no previous case involved similar facts, and concluded "from all of the evidence that the principle of discounting the value of stock to allow for a minority interest factor should not be applied in this instance." 291 F.Supp. at 352. The statement of the *Blanchard* facts suffices to distinguish the case. No one would argue with the proposition that the Blanchard stock should be valued as a control block, if there had been a written agreement amongst the Blanchards to sell it as a control block. The court in *Blanchard* expressly found an informal agreement. 291 F.Supp. at 351.[6] To the extent that any language in *Blanchard* implies that the family attribution should apply to attribute family owned stock to a decedent's stock interest, we decline to follow it for the reasons set out in this opinion.

The government might also have cited *Driver v. United States*, 38 AFTR2d 76–6315 (W.D.Wis.1976). There the donor owned all the stock of a family corporation. In two series of gifts on December 31, 1968, and January 2, 1969, the donor gave stock to her nephew and his wife and children representing 66% of the outstanding stock. She also gave 14% to her sister, and 4% to a long time employee and his wife. The donor retained 16% of the stock. Although the nephew's immediate family ended up with 66%, no one of them was given as much as 50%. The court treated the gifts on the two days as constituting in substance a single gift. More significant for our purposes, the court expressly applied family attribution: "Between the two transfers on December 31, 1968, and January 2, 1969, Miss Burgi [the donor] transferred a majority interest and control to her nephew and the members of his family. Accordingly, it is unreal to be talking about the December 31, 1968, transaction as the transfer of a

minority interest." 38 AFTR2d at 76–6319. Although the court purported to find *Whittemore v. Fitzpatrick, supra,* factually distinguishable, we can find no significant factual difference, and we conclude that *Driver* implicitly rejects the *Whittemore* holding that the gift to each donee must be valued separately as a minority interest, notwithstanding the fact that the aggregate shares simultaneously given to the donor's three sons would constitute control. Our research has led us to the conclusion that *Driver* stands alone in judicially engrafting a family attribution doctrine upon the standards governing gift or estate tax valuation, and, for the reasons set out in this opinion, we decline to follow it.

We conclude that the case law reflects long established precedent that family attribution should not apply to lump a decedent's stock with that of related parties for estate tax valuation purposes. This constitutes our first reason for rejecting family attribution in the instant context.

Our second reason for rejecting this kind of family attribution is our conclusion that the doctrine is logically inconsistent with the willing buyer-seller rule set out in the regulations. Reg. 20.2031–1(b) provides in pertinent part:

> The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.

This cardinal rule for determining value has been universally applied, both by the Internal Revenue Service[7] and the courts.

It is apparent from the language of the regulation that the "willing seller" is not the estate itself, but is a hypothetical seller. In Revenue Ruling 59–60, the Internal Revenue Service has so held:

> Court decisions frequently state in addition that the *hypothetical* buyer and seller are assumed to be able, as well as

**6.** For a similar distinction of the *Blanchard* case, see 1 Mertens' Law of Federal Gift and Estate Taxation, § 8.06 (Cumm.Supp.1975).

**7.** See Rev.Rul. 59–60, 1959–1 C.B. 237, modified by Rev.Rul. 65–193, 1965–2 C.B. 370; and Rev.Rul. 77–287, 1977–2 C.B. 319.

willing, to trade and to be well informed about the property and concerning the market for such property.

1959–1 C.B. at 237 (emphasis added). Courts also have so held. In *United States v. Simmons*, 346 F.2d 213, 217 (5th Cir. 1965), this court said that "the 'willing buyer and seller' are a hypothetical buyer and seller having a reasonable knowledge of relevant facts." In *Rothgery v. United States*, 475 F.2d 591 (Ct.Cl.1973), the Court of Claims said:

> [I]t is necessary to begin the resolution of any valuation problem by presupposing a "willing seller." In the present case, therefore, we must begin with the assumption that the decedent's 125 shares of stock in the corporation were not bequeathed by the decedent to his son, the plaintiff, and that such shares were available for sale by the decedent's estate as a "willing seller."

475 F.2d at 594.

The notion of the "willing seller" as being hypothetical is also supported by the theory that the estate tax is an excise tax on the transfer of property at death and accordingly that the valuation is to be made as of the moment of death and is to be measured by the interest that passes, as contrasted with the interest held by the decedent before death or the interest held by the legatee after death. Earlier in this opinion, we noticed that our *United States v. Land, supra*, decision logically requires a holding that the relationship between Mr. and Mrs. Bright and their stock is an irrelevant, before death fact. Thus, it is clear that the "willing seller" cannot be identified with Mrs. Bright, and therefore there can be no family attribution with respect to those related to Mrs. Bright. Similarly, the dictum in *Land*—that valuation is not determined by the value of the interest in the hands of the legatee—means that the "willing seller" cannot be identified with Mr. Bright as executor or as trustee of the testamentary trust. Therefore, there can be no family

attribution based on identity of the executor and trustee, Mr. Bright. The *Land* dictum is established law. *Edwards v. Slocum*, 264 U.S. at 62, 44 S.Ct. at 293 (Holmes, J. saying, "It [the tax] comes into existence before, and is independent of, the receipt of the property by the legatee."); *Ithaca Trust Co. v. United States*, 279 U.S. at 155, 49 S.Ct. at 292 (Holmes, J. saying, "The tax is on the act of the testator, not on the receipt of the property by the legatees."); *Walter v. United States*, 341 F.2d 182, 185 (6th Cir. 1965) ("[T]he estate tax is imposed upon the *transfer* of property by a decedent, and not the *receipt* of property by a beneficiary ...." (emphasis in original)); *See also Commissioner v. Chase Manhattan Bank*, 259 F.2d 231, 255 (5th Cir. 1958); *Connecticut Bank and Trust Company v. United States*, 439 F.2d 931, 935 (2nd Cir. 1971); Reg. 20.2033–1(a) ("[S]uch tax is an excise tax on the transfer of property at death and is not a tax on the property transferred."). The *Land* dictum also comports with common sense. It would be strange indeed if the estate tax value of a block of stock would vary depending upon the legatee to whom it was devised.

Our final reason for rejecting family attribution is based upon the important policy that the law should be stable and predictable. This policy is especially important in the tax laws, because there is widespread reliance by taxpayers upon established tax principles in planning their affairs. *Estate of Hattie L. McNary v. Commissioner of Internal Revenue*, 47 T.C. 467 (1967). Accordingly, we decline the government's invitation to depart from *Estate of Lee v. Commissioner, supra*, and the numerous other cases cited and discussed above.[8]

Accordingly, we affirm the district court's ruling to the extent that it defined the interest to be valued as equivalent to 27½% of the stock, to the extent that it excluded as evidence of value the fact that the estate's stock had, prior to decedent's

---

8. We note that the Internal Revenue Service has acquiesced in several of the Tax Court cases which have applied a minority discount for estate tax valuation purposes notwithstand-
ing the family control of the corporation at issue. See *Mathilde B. Hooper v. Commissioner, supra*; *Estate of Harry Leyman, supra*; *Estate of Louis Zaiger, supra*.

death, been held jointly with Mr. Bright's interest as community property, and the fact that, after death, the particular executor (Mr. Bright) and legatee (Mr. Bright as trustee) was related to another stock holder (Mr. Bright individually), and to the extent that it excluded any evidence that Mr. Bright, as executor or trustee, would have refused to sell the estate's 27½% block except in conjunction with his own stock and as part of a 55% control block. We hold that family attribution cannot be applied to lump the estate's stock to that of any related party, but rather that the stock is deemed to be held by a hypothetical seller who is related to no one.

Having rejected the heart of the government's arguments, we turn finally to a secondary argument raised by the government for the first time on appeal. The district court ruled before trial that "no element of control can be attributed to the decedent in determining the value of the decedent's interest in the stock" and that the parties must try the case on that basis. (R. 115.) We have held that decedent's interest did not constitute control, and that there can be no family attribution to lump the estate's stock with that of related parties. However, the government complained at oral argument that the district court's order sweeps more broadly, and that the order prevented the introduction of evidence which would have been proper. For example, although the "willing buyer" is also hypothetical, both he and the "willing seller" would have "reasonable knowledge of relevant facts." Reg. 20.2031–1(b). Thus, both the "willing seller" and the "willing buyer" would know that Mr. Bright individually owned, as of the date of death, 27½% of the stock, that Mr. Schiff owned 30%, that the 27½% being offered by the "willing seller" would provide the margin of control for either Mr. Bright or Mr. Schiff, and that the "willing buyer" might negotiate a resale to either Mr. Bright or Mr. Schiff. The government contends that the foregoing facts constitute admissible evidence, and that such facts might affect the value of the 27½% minority interest which is to be valued. The relevance of such facts, the

government argues, is contemplated by the willing buyer-seller rule, which presupposes that they both have "reasonable knowledge of relevant facts." Such facts are to be distinguished from the kind of facts which we have held to be irrelevant on account of their derivation from family attribution based on the identity of the decedent, the executor or the legatee. Family attribution facts are irrelevant because the valuation is based on a sale by a *hypothetical seller*—not Mrs. Bright, not Mr. Bright as Executor and not Mr. Bright as trustee—who is related to no one. The "willing buyer-seller" rule renders irrelevant only the real seller and buyer, not the other stockholders. Thus, while the identities of decedent, the decedent's estate and the decedent's legatee are irrelevant, the remaining stockholders in the corporation are in no sense hypothetical. Thus, the government argues that such facts are among the "relevant facts" of which the hypothetical seller and buyer have knowledge. Although this particular application of the willing buyer-seller rule has not been widely recognized, a few cases have acknowledged the relevance of such facts. *Marian Otis Chandler*, 10 T.C.M. (P–H) ¶ 41,193 at p. 41–392 (1941); *Estate of Bernon Prentice*, 25 T.C.M. (P–H) ¶ 56,003 (1956) ("There is evidence that a block of stock of Fulton Trust of the size owned by the decedent could not have been sold at one time on the over-the-counter market at prevailing prices, and that the holder of such a block would probably be forced to take the lower price in order to dispose of it. On the other hand, there is testimony that such a block might bring a higher price than market, if a buyer could be found who wanted to acquire control of the bank." At p. 16). *Estate of Marjorie Gilbert Brush*, 32 T.C.M. (P–H) ¶ 63,186 (1963) ("And these statements may further tend to indicate that the substantial number of shares held by the decedent's estate may for such reason have had greater value as a single block, because of their potential for affording 'leverage' to a potential buyer or buyers in acquiring a controlling stock interest." At p. 1032). See also *United States v.*

Simmons, supra; Rothgery v. United States, 475 F.2d at 594; Estate of Tully, Sr. v. United States, 41 AFTR2d 78–1477 (1978).

Although we assume arguendo that such facts are admissible, as the government urges, we need not reach the issue of whether the district court's pretrial order in this case was too broad, i. e., whether the order precluded the introduction of such facts. We have searched the record carefully, and have concluded that the government did not raise this issue in the court below. The issue was raised only vaguely, if at all, in the government's briefs to the panel and the en banc court. At oral argument, the issue was clearly raised for the first time. Because the government failed to raise this issue in the district court and because we find that no miscarriage of justice will result, we decline to entertain it on appeal.[9] Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724 (5th Cir. 1980); Martin Oil Co. v. Gulf Ins. Co., 605 F.2d 197 (5th Cir. 1979). Higginbotham v. Ford Motor Co., 540 F.2d 762, 768 n. 10 (5th Cir. 1976).

For the foregoing reasons, we

AFFIRM.

ALVIN B. RUBIN, Circuit Judge, with whom VANCE, FRANK M. JOHNSON, Jr., POLITZ and HATCHETT, Circuit Judges, join, dissenting:

It requires my brethren ten pages of manuscript to explain why they affirm the valuation for estate tax purposes of stock at an amount that is but 27% of the value that the taxpayer's own experts placed on that stock's pro rata share of the corporation's "public value." Thus, stock that, according to the bearish view of the taxpayer's appraisers, would have a "public value" of $4.4 million is valued at $1.2 million for tax purposes.[1] The estate tax law imposes a tax based on fair market value and the majority affirms a tax refund on the basis

---

**9.** Judge Rubin's dissent suggests the possibility that the government did in fact raise the issue by arguing to the district court the established law that a minority discount must be supported by substantial evidence and that the requested ruling would be erroneous because it would constitute a ruling that a minority discount was required as a matter of law. With deference to Judge Rubin, we cannot thus stretch the government's argument. The government erroneously perceived the district court's ruling as mandating a minority discount—in fact, the ruling held only that the interest to be valued was a 27½% interest, leaving the obligation upon taxpayer to adduce proof at trial to support a minority discount, which obligation the taxpayer amply satisfied. To support its erroneous assumption, the government then cited the well-established law that a minority discount must be supported by substantial evidence. We fail to see how this general argument is sufficient to raise the very specific issue now before us relating to evidence of some enhancement in value because Mr. Bright individually owns 27½% and Mr. Schiff owns 30% and the stock at issue would provide the margin of control to either. This is especially so in the instant case because the government's general argument was focused upon a problem entirely unrelated to the issue before us, i. e., the government's focus was its misconception that the district court was about to rule as a matter of law that a minority discount was mandated. The government has made no showing of any miscarriage of justice, and the

record reveals none. Indeed, the record suggests that the government may have been aware of this "swing value" issue. See R. 190–91. Whether the government declined to pursue the issue at trial because Mr. Bright and Mr. Schiff had been long time business partners, or for other reasons, we perceive no manifest injustice which should put the parties here to another trial.

1. The valuation was made in the following fashion:

| | |
|---|---|
| Total "public value" of stock of ETMF and Rock Companies | $ 6,100,000 |
| Total "public value" of stock of Southern Trust | $ 9,910,836 |
| Value of all stock involved | $16,010,836 |
| 27.5% interest in stock passed at decedent's death | $ 4,402,970 |
| Less: Discount 50% for illiquidity and unmarketability of minority interest | $(2,201,485) |
| Discount 23% to take into account term loan agreements, guarantees and pledges that affect the stock's value | $(1,012,683) |
| Total discounts | $(3,214,168) |
| Net value | $ 1,188,802 |

(Rounded off to $1.2 million)

Hence, the estate tax valuation is but 27% of the total public value of the decedent's stock.

of a record from which evidence relevant to the determination of that value was excluded. I, therefore, respectfully dissent from the result reached. I would remand the case so that all of the admissible evidence can be weighed.

Like the majority, I reject many of the government's contentions. The time for evaluation of donated stock is the moment of transfer. Whether stock transferred either inter vivos or upon death was, before its transfer, held in community with the owner's spouse is, of course, irrelevant to its value at the moment of transfer. So, too, is the kinship of the decedent with other stockholders.[2]

While my colleagues discuss at length why the value of the 27.5% interest should not be enhanced because it is part of a majority block and thus controls the corporation, they do not discuss why it should be discounted to one-half its public value because it is a minority interest. An appraisal based on "public value" of $4.4 million might be increased if control-value is considered. It does not necessarily follow that, because the control-value premium cannot be added, a subtraction because the stock represents a minority interest is correct.

The value that must be determined is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Reg. 20.2031–1(b). This classic formulation assumes shrewd traders on both sides. Such traders would know that Mr. Bright owned 27.5% of the stock, Mr. Schiff owned 30%, and that the 27.5% available from the willing seller would give control to Bright or to Schiff or could be used to maneuver a course between them. My colleagues agree that these facts would be admissible evidence and that the facts at least "might" affect the fair market value of the 27.5% interest.

They conclude, however, that the government did not sufficiently raise the issue below. It is, of course, correct that a proffer of the additional evidence concerning what a willing seller would take and a buyer would pay was never made. In opposing the pre-trial ruling, however, the government contended that a ruling that the stock must not be valued as a portion of a control block meant that the court was imposing a discount by prehearing fiat and that this was both premature, foreclosing admissible evidence, and erroneous. It was sufficient to make the argument once. Protest is enough even if it is not strenuous, belabored, or reurged in request for reconsideration.

My colleagues conclude that the result they achieve is no gross miscarriage of justice. How they know this is a mystery. If all of the evidence had been admitted, the stock might have been appraised at $4.4 million, the pro rata share of the public value of the stock, or at more than that figure (because of the premium its bargaining position would command) or at less than that figure (because the willing buyer might think the middle bargaining position undesirable rather than desirable or might take into account the loan agreements and other encumbrances relied on by the district court). The stock might, of course, have then been valued at only $1.2 million. We can know that this valuation is not grossly unjust only if we compare it to a just result—and both the trial court and the majority have prevented the introduction of the evidence that would disclose the correctness or incorrectness of the a priori surmise that no gross injustice is being done.

Insofar as the pretrial order ruled that the stock should not be valued as part of the community, it was correct. Insofar as it went further, it was premature and it foreclosed evidence plainly admissible. Because this barrier excluded light that might have revealed the fair market value of the

---

**2.** The government does not, as the majority puts it, seek family attribution. However, for the reasons given by the majority in the first portion of its opinion, the tax collector's position is unsound on any theory.

stock and, indeed, the possible gross injustice of valuing it at 27% of its "public value," I respectfully dissent.

TATE, Circuit Judge, dissenting:

The writer substantially concurs in the dissent of Judge Rubin. He would go further, however, and would adhere to the essential rationale of the panel opinion, 619 F.2d 407 (1980): for federal estate tax purposes, neither federal tax regulation nor Texas state law prevent the Commissioner from valuing, in accord with economic reality, the wife's interest transferred at the moment of her death as constituting a one-half interest in a majority ownership of the stock of a closely held corporation; nor require that the interest so transferred be fictitiously valued as if it were instead only a minority interest in such closely held corporation (that has been in fact controlled by the majority block that included the decedent's holding in indivision, i. e., by tenancy in common).

I therefore respectfully dissent.