JOHN R. MOORE AND VIOLA K. MOORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moore v. Commissioner
Docket No. 18122-88
United States Tax Court
T.C. Memo 1991-546; 1991 Tax Ct. Memo LEXIS 586; 62 T.C.M. (CCH) 1128; T.C.M. (RIA) 91546; October 31, 1991, Filed *586 Decision will be entered under Rule 155. John D. Moats, for the petitioners. Robert A. Varra, for the respondent. RUWE, Judge. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax in petitioners' Federal gift tax as follows: Addition to Tax
Petitioner
Taxable Year Ended
Deficiency
Sec. 6660 [1]
John R. Moore
December 31, 1984
$ 54,833
$ 5,483
Viola K. Moore
December 31, 1984
$ 54,833
$ 5,483
The issues for decision are: (1) Whether petitioners properly valued interests in a partnership which they gave to various individuals and trusts during 1984 for purposes of computing the gift tax under section 2501; and (2) whether petitioners are liable for additions to tax for valuation understatement under section 6660. FINDINGS OF FACT
*587 Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners were husband and wife and resided in the State of Colorado at the time that they filed their petition in this case. Beginning around 1900, petitioner Viola K. Moore's grandfather acquired and began farming land in Colorado. Eventually, Viola K. Moore inherited an interest in this farming operation. Since 1970, the farming operation has been conducted through a partnership known as the K & M Company (K & M). The only partners identified on K & M's 1970 partnership return (Form 1065) were the Viola K. Moore Trust and the John R. Moore Trust. K & M is a Colorado general partnership which was originally organized pursuant to a partnership agreement dated October 22, 1970, and which is currently operating pursuant to a new partnership agreement executed on April 30, 1976. K & M owns and operates approximately 20 farm and ranch properties in northern Colorado. K & M raises cattle and crops, consisting primarily of corn, alfalfa, barley, and sugar beets. All the farms are rented to tenants. One of the purposes for forming *588 K & M was to create an entity through which interests in the various farming properties could be passed to younger generations through gifts of interests in the entity. The timing, size, and value of the gifts were all structured to take advantage of the gift tax exclusion. Another reason for forming K & M was to operate the farms through one entity. The partners do not contemplate liquidating K & M and plan to keep it as a family farming operation as long as possible. K & M's partnership agreement which was executed on April 30, 1976, provides in part: [2]
Article V PROFITS and LOSSES Net profits or net losses of the partnership shall be distributed or chargeable to each of the partners in the same proportion as his capital contribution is to the entire partnership contribution * * *. * * * Each partner *589 shall be authorized to draw funds from the partnership, limited however, to his interest in the net profits. Any such draw shall be chargeable against that partner's individual income account, and the total amount withdrawn by each partner during the fiscal year shall be deducted from his share of the net profits. Article VI MANAGEMENT AND CONTROL Each partner shall have a voice in the management and conduct of the partnership business; and the partners shall conduct a meeting, at least annually, to discuss the conduct and management of the partnership, and to agree upon a general course of conduct for the ensuing year. Day-to-day management of the partnership shall be conducted by a managing partner or partners who shall be selected each year at the annual meeting. In the selection of the managing partner or partners, and in all other matters discussed and determined at each annual meeting, the partners shall have votes equal in percentage as their respective capital accounts relates to the total capital account of the partnership, and decisions shall be made by the vote of partners owning a majority of the partnership, as shown in the respective capital accounts. Article *590 VII SALARY Each partner shall receive such salary as, from time to time, is agreed upon. Such salary shall be treated as an operating expense and shall not be charged against the interest of the partner receiving the salary in the partnership assets or profits. * * * Article XII GOOD WILL In arriving at the value of the interest of any retiring, withdrawing or deceased partner, as provided herein, there shall be no charge against the remaining partners for the good will. The good will of the business shall not be valued and shall not form a part of the assets of the business. Article XIII CHANGE IN PARTNERS (A) New Partner: The admission of new partners to the partnership is authorized, and shall be accomplished by the unanimous approval of the existing partners. A supplemental agreement shall be created prior to admission of a new partner. The supplemental agreement shall provide, as a minimum: (1) the contributions, if any, to the partnership capital, required of the new partner; (2) his percentage interest in the partnership; (3) any special or official duties the new partner shall have in the partnership; and (4) the adjusted percentage of interests in the partnership *591 of all existing partners based on the new partner's contribution. All partners shall execute the supplemental agreement, which shall then be attached hereto as an exhibit. (B) Withdrawing Partner: No partner shall withdraw from the partnership for any reason during the term of this agreement without obtaining prior written consent of the partners. Any withdrawal without consent shall not discharge that partner from additional liability for losses incurred by the partnership. Prior to granting or denying approval of a partner's request to withdraw, the remaining partners shall have the option to purchase a proportionate share of his interest in the partnership. On election to exercise the option, the withdrawing partner shall immediately be paid the appraised value of his share, and the remaining partners' interest shall be proportionately increased. If any remaining partner approves of the withdrawal of a partner, but does not desire to purchase a portion of his share, the other remaining partners may purchase the additional segment and thereby obtain a larger proportionate share of the partnership. If no remaining partner elects to purchase, the withdrawing partner shall *592 withdraw, in kind, real or personal property of the partnership, as selected by the remaining partners, and equal, in appraisal value, to his percentage share of the partnership. The appraisal shall be made by an independent appraiser selected by the remaining partners. (C) Assignment of Interest: No partner shall assign his interest in this partnership, either totally or partially, to a third party, and thereby withdraw from the liabilities and duties as a partner, unless he has obtained the prior written consent of all remaining partners to the assignment and their approval of the substitution of the assignee as a party hereto. * * * Article XIV DISSOLUTION The partnership may be dissolved on the election of partners representing a majority of the outstanding partnership interest. All partners shall be given 30 days prior written notice of the time and place of any meeting for the election to dissolve the partnership. * * * Article XV ARBITRATION If any difference shall arise between or among the partners as to their rights or liabilities under this agreement, or any instrument made in furtherance of the partnership business, the difference shall be determined and *593 the instrument settled by a disinterested arbitrator selected by a simple majority of the partners. Said arbitrator's decision shall be final as to content and interpretation of the instrument, and as to the proper mode of carrying the provisions into effect.
For the years 1970 through 1983, the only salaries paid by K & M were paid to its managing partners, John R. Moore and his son, Thomas K. Moore. Total salaries paid during the years 1970 through 1983 were: Year
Salary
1970
$ 0
1971
18,000
1972
23,700
1973
29,799
1974
12,028
1975
25,889
1976
17,000
1977
19,500
1978
19,500
1979
18,750
1980
18,000
1981
18,000
1982
15,000
1983
15,000
During each of the years 1970 through 1984, petitioners each made gifts of interests in the partnership. These gifts were made to the following individuals: Name
Relationship
Thomas K. Moore
Son
Marylee M. Moore
Daughter
James R. Kistler
Son-in-law
Nancy S. Moore
Daughter-in-law
Augustus S. Moore Trust
Grandchild
Sadie E. Moore Trust
Grandchild
Sally J. Moore Trust
Grandchild
Jessica T. Kistler Trust
Grandchild
The fair market value of K & M as of April 13, 1984, is equal to its net asset value. The total *594 net asset value of K & M on April 13, 1984, was $ 7,386,000. On April 13, 1984, petitioners each made gifts of interests in K & M (sometimes referred to as the partnership interests) to Thomas K. Moore, Marylee M. Moore, Nancy S. Moore, Augustus S. Moore Trust, Sadie E. Moore Trust, Sally J. Moore Trust, and Jessica T. Kistler Trust. The pro rata value [3] of each partnership interest given by each petitioner to each of the individual family member recipients was $ 16,663 and represented a 0.2256-percent interest in the partnership. The value of each such partnership interest as reported on petitioners' 1984 gift tax returns was $ 9,998. The pro rata value of each partnership interest given by each petitioner to each of the trusts was $ 68,749 and represented a 0.9308-percent interest in the partnership. The value of each such partnership interest as reported on petitioners' 1984 gift tax returns was $ 41,249. *595 Ownership of the partnership before and after the April 13, 1984, gifts was as follows: Percentage interest
Percentage interest
before 4/13/84 gifts
after 4/13/84 gifts
John R. Moore
14.9813%
10.5813%
Viola K. Moore
14.9813%
10.5813%
Thomas K. Moore
38.8211%
39.2723%
Marylee M. Kistler
21.5184%
21.9696%
Nancy S. Moore
2.0955%
2.5467%
Augustus S. Moore Trust
1.9006%
3.7622%
Sadie E. Moore Trust
1.9006%
3.7622%
Sally J. Moore Trust
1.9006%
3.7622%
Jessica T. Kistler Trust
1.9006%
3.7622%
The difference between the pro rata value and the value reported on the gift tax returns results from a 40-percent discount that petitioners applied to the pro rata value for purposes of gift tax valuation. Petitioners claim that this 40-percent discount accurately reflects the price at which the interests in the partnership would exchange between a willing buyer and seller. Respondent determined that the proper value of the partnership interests was the pro rata value of the interest less a 10-percent discount. As a result of gifts which they made over a period of years prior to 1984, petitioners transferred a 2.0525-percent interest in K & M to their son-in-law, *596 James R. Kistler. Petitioners' daughter and James R. Kistler were eventually divorced. On March 22, 1984, subsequent to the divorce, K & M purchased Mr. Kistler's interest in the partnership for $ 90,959. This price represented the pro rata value of a 2.0525-percent interest in the partnership assets, discounted by 40 percent. At the time of the purchase, Mr. Kistler was over 30 years of age, had received a master's degree in botany, and was working on a doctorate in agronomy. OPINION The first issue for decision is whether petitioners properly valued the gifts of the partnership interests for purposes of the section 2501 gift tax. Section 2501 imposes a tax on property transferred by gift. If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. Sec. 2512(a). The value of the property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of the relevant facts. Sec. 25.2512-1, Gift Tax Regs. The valuation of an interest in property for Federal tax purposes is a question of *597 fact. Sec. 25.2512-3(a), Gift Tax Regs.; Estate of Watts v. Commissioner, 823 F.2d 483, 485 (11th Cir. 1987), affg. a Memorandum Opinion of this Court. Petitioners bear the burden of proving that respondent's valuation is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). The parties agree that the net value of the partnership's assets as of the date of the gift was $ 7,386,000, and that the fair market value of the partnership is equal to this net asset value. The parties disagree on the amount of discount which should be taken into account to determine the price at which a minority interest in the partnership would change hands between a willing buyer and a willing seller. Petitioners argue that as much as a 50-percent discount should be applied to the minority interest, and respondent argues that a 10-percent discount should be applied. Both parties rely heavily on expert opinion to support their respective minority interest discounts. We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); *598 Parker v. Commissioner, 86 T.C. 547, 561 (1986); Johnson v. Commissioner, 85 T.C. 469, 477 (1985). We are not bound, however, by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Newhouse v. Commissioner, supra at 217; Parker v. Commissioner, supra at 561. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, supra at 562. Consequently, we will take into account expert opinion testimony to the extent it aids us in arriving at the fair market value of the property which was the subject of the gift. Petitioners rely on the report and testimony of their expert, John P. Lindquist. [4] Mr. Lindquist is president of Quist Financial, a firm which is involved in mergers and acquisitions and which performs business appraisals. Mr. Lindquist has published a book and several articles on valuation topics and has valued 500 or more businesses. *599 Mr. Lindquist's report concludes that a discount of as much as 50 percent is appropriate in order to value properly the partnership interests. According to Mr. Lindquist, 30 percent of this discount is attributable to the unfavorable aspects of a minority interest in a partnership. Specifically, Mr. Lindquist found that a minority interest in a partnership: (1) Could not select the managers of the business; (2) had no control over management policies; (3) could not control the salaries of the managers; and (4) could not determine asset acquisitions or dispositions. Mr. Lindquist's report also discounts the interests by an additional 20 percent in order to reflect the lack of liquidity of the partnership interests. Mr. Lindquist reasoned that while the shareholder in a publicly held corporation could convert his shares into liquid assets (cash) in a relatively brief period of time, the minority partners in K & M had no such opportunity. Mr. Lindquist justified his additional 20-percent discount on the basis that: (1) There was no established market for the partnership interests; (2) minority partners could not force liquidation; (3) there was no expectation that partners representing *600 a controlling interest would consent to a liquidation of some or all of the partnership assets; (4) partners could not assign their interests without the approval of the remaining partners; (5) partners could not withdraw from the partnership without the consent of the remaining partners; (6) in the event that a minority partner chose to withdraw from the partnership, the remaining partners had the option to acquire his interest; (7) as of December 1983, there was an abundance of farm properties on the market; (8) there was little likelihood that the remaining partners would repurchase an interest without demanding a discount; and (9) under the partnership agreement, partners who withdrew from the partnership without the consent of the remaining partners were not discharged from additional liabilities incurred by the partnership. At trial, Mr. Lindquist testified that he determined the value of the partnership interests by following the procedure established in Rev. Rul. 59-60, 1959-1 C.B. 237. Pursuant to this procedure, Mr. Lindquist considered numerous factors such as the operating and economic history of the business, the nature of the business, the *601 economic outlook, the value of and existing market for farm land in Colorado, the partnership agreement, and the rate of return on partnership equity. Mr. Lindquist also testified that he decreased the value of the interests because he believed that some of the provisions of the partnership agreement were questionable under Colorado law and that a willing buyer would consider whether these provisions raised the potential for litigation. We have several problems with Mr. Lindquist's valuation. First, his report and trial testimony are inconsistent in that they indicate different methodologies for valuing the partnership interests. The report indicates that he valued the interests by discounting the fair market value of the business to reflect the lack of control and illiquidity associated with the minority interests. His trial testimony indicates that he valued the partnership interests under the procedure prescribed in Rev. Rul. 59-60, 1959-1 C.B. 237. [5] Second, we disagree with his application of many of the factors listed in Rev. Rul. 59-60, 1959-1 C.B. 237, as many of these factors pertain to the valuation of the business *602 as a whole and do not pertain to the discount given for minority interests. The parties have already stipulated the value of the partnership, and considering these factors a second time when determining the minority discount in effect double counts these factors. Third, Mr. Lindquist testified that, when arriving at the 20-percent discount for illiquidity, he attached the most significance to the fact that there was no established market for the partnership interests, there was no expectation that partners representing a controlling interest would consent to a liquidation of some or all the partnership assets, as of December 1983, there was an abundance of farm properties on the market, and there was little likelihood that the remaining partners would repurchase an interest without demanding a discount. These factors are already largely reflected in either the original valuation of the partnership or the 30-percent minority interest discount and are unnecessarily counted again for purposes of the 20-percent discount. Finally, Mr. Lindquist seems to have focused too much on the willing buyer portion of the fair market value definition. He failed to consider whether a seller, under *603 no compulsion to sell, would discount the pro rata value of his interest by 40 or 50 percent in order to consummate the sale. [6]
Mr. Lindquist's report relies to a certain extent on the discount given to buyers of minority interests in publicly held corporations. Mr. Lindquist determined that the limitations on minority-interest holders in these corporations were similar to the limitations on the minority interests in the partnership. Mr. Lindquist found that discounts for minority interests in publicly traded corporations ranged from 25 to 40 percent, and that a discount *604 of 30 percent for a minority interest in K & M was fully justified. At trial, Mr. Lindquist indicated that he did not look at other publicly held corporations, but instead contacted companies which bought and sold real estate partnership interests, and that it was these interests which were sold on the secondary market at a discount. Respondent's expert, Yale Kramer, testified that 20 to 40 percent of the original purchase price of these types of partnership interests went to organizational fees, and that only 60 to 80 percent of the original investment went to purchase assets. Mr. Kramer also testified that because only a fraction of the original investment actually went to the purchase of assets, these partnership interests sold at a discount on the secondary market. To the extent that we are not sure whether Mr. Lindquist looked at the secondary market for real estate partnerships or the market for unspecified publicly traded corporations, and in light of the explanation given by Mr. Kramer, we give little weight to this portion of Mr. Lindquist's report. Despite our concerns, Mr. Lindquist's analysis makes several important and valid points. Mr. Lindquist discounted the *605 pro rata value to reflect lack of control associated with a minority interest. Courts have long recognized that the shares of stock of a corporation which represent a minority interest are usually worth less than a proportionate share of the value of the assets of the corporation. Estate of Bright v. United States, 658 F.2d 999 (5th Cir. 1981) (en banc); Estate of Newhouse v. Commissioner, 94 T.C. at 249; Ward v. Commissioner, 87 T.C. 78, 106 (1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 953 (1982); Estate of de Guebriant v. Commissioner, 14 T.C. 611, 618 (1950), revd. on other grounds sub nom. Claflin v. Commissioner, 186 F.2d 307 (2d Cir. 1951); Estate of Hooper v. Commissioner, 41 B.T.A. 114, 129 (1940). The minority discount is recognized because the holder of a minority interest lacks control over corporate policy, cannot direct the payment of dividends, and cannot compel a liquidation of corporate assets. See Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); *606 Estate of Andrews v. Commissioner, supra at 953. Although these cases deal with minority interest in closely held corporations, we see no reason for a different rule for valuing partnership interests in this case. See Harwood v. Commissioner, supra.The critical factor is lack of control, be it as a minority partner or as a minority shareholder. Respondent argues on brief that the interests at issue are different from those of a minority shareholder because a minority partner can withdraw from the partnership. While this may be relevant to the discount for illiquidity, it does not address the lack of control that the minority discount is intended to account for. [7] Respondent admits on brief that the minority partners cannot control the operation and management of the partnership but argues that, nonetheless, they do have a voice in management. We fail to see how the vote of the fractional interests which were the subject of the gifts in this case provides much of a voice in management.
*607 Mr. Lindquist also discounted the minority interests because of the limitations on withdrawing, selling, and assigning partnership interests. Respondent argues that a discount for this is unwarranted because these limitations are unenforceable under Colorado law. At trial, petitioners' counsel stated that the enforceability of the provisions was not really at issue; it was the fact that a buyer would see these provisions in the agreement and recognize the potential for litigation that justified the discount. Without deciding the State law issue, we agree with petitioners that a hypothetical buyer would pay less for the partnership interests either because he felt that the provisions in the agreement limited his ability to transfer his interests or because even if the limitations were not binding, he might have to litigate the issue. Estate of Newhouse v. Commissioner, supra at 232-233. Given the relatively small size and value of the minority interests at issue, we believe that a potential buyer would recognize this as a significant factor. Assuming that a partner could withdraw from the partnership, the partnership agreement nevertheless provides the *608 remaining partners with the opportunity to purchase the withdrawing partner's interest and pay the withdrawing partner "the appraised value of his share" in the partnership. It is the withdrawing partner's share in the partnership, not a proportionate percentage of partnership assets, that is to be valued. The partnership agreement provides that in the event no partner exercises his right to purchase the withdrawing partner's share in the partnership, then and only then will the withdrawing partner be given property of the partnership "equal, in appraised value, to his percentage share of the partnership." Respondent interprets this last clause as entitling the withdrawing partner to a percentage of the value of partnership property, equal to the partner's percentage interest. Even if this interpretation is correct, the provision would unlikely become relevant since the remaining partners would be expected to exercise their option to pay a lesser value for the partnership interest. [8]
*609 Mr. Lindquist also considered the 1984 sale of Mr. Kistler's partnership interest to the partnership. We have previously held that when determining the value of a business interest for which no market exists, actual arm's-length sales of the interest within a reasonable time of the valuation date are the best criteria of market value. Ward v. Commissioner, 87 T.C. at 101; Estate of Andrews v. Commissioner, 79 T.C. at 940; Duncan Industries, Inc. v. Commissioner, 73 T.C. 266, 276 (1979). Respondent argues that Mr. Kistler's sale carries little weight because it was not at arm's length but was instead part of Mr. Kistler's divorce settlement with petitioners' daughter. Respondent did not call Mr. Kistler or any other witnesses to testify about this transaction. John R. Moore, however, testified that the sale was not part of the divorce settlement. Respondent argues that the time of sale and the apparent time of the divorce indicate that the sale was part of the divorce settlement. The record, however, does not reflect the date of the divorce, and there is no evidence which supports respondent's allegation. In light *610 of this, we find that the sale deserves more weight than respondent gives it. Respondent relies on the testimony of his expert, Mr. Kramer. Mr. Kramer is a senior member of the American Society of Appraisers, on the Business Law Committee of the American Institute of Certified Public Accountants, and a member of the Des Monies Society of Financial Analysts. Mr. Kramer, like Mr. Lindquist, is also involved with private companies which appraise, buy, and sell businesses. Mr. Kramer began his valuation with the fair market value of the whole partnership as stipulated by the parties. Mr. Kramer then tried to determine the appropriate discount to be applied to the gift of the minority interests. In determining the discount, Mr. Kramer specifically excluded the factors in Rev. Rul. 59-60, 1959-1 C.B. 237, which pertain to the fair market value of the assets, because he felt that these factors were irrelevant in light of the parties' stipulation to fair market value. Mr. Kramer considered the differences between a partnership and a closely held corporation, the perspectives of both the willing buyer and the willing seller, the sale to Mr. Kistler, and the *611 various provisions under the partnership agreement which pertain to control, salary, distribution of profits and withdrawal. Mr. Kramer determined that a 10-percent discount appropriately reflected the value of the partnership interests. Mr. Kramer applied a "decision tree" analysis which focused on the withdrawal provisions of the partnership agreement and its enforceability under Colorado law to arrive at the 10-percent figure. Mr. Kramer determined that if Colorado law prohibited the partners from unreasonably withholding their consent to withdrawal, then a 5-percent discount was appropriate. Alternatively, if consent could be withheld unreasonably, but a partner legally could require a dissolution of the partnership, then a 10-percent discount was appropriate. Finally, if consent could be withheld unreasonably, and a partner could not require a dissolution, then a 15-percent discount would be appropriate. We have several problems with Mr. Kramer's report. First, Mr. Kramer claims that he considered various aspects of the partnership interests, but his final analysis seems to look only at the withdrawal provision of the partnership agreement. Thus, the discount for lack *612 of control during the operation of the partnership does not appear to have been given much weight. Second, Mr. Kramer testified that he does not consider himself an expert on Colorado partnership law, and yet his discount figure seems to hinge on the assumption that various outcomes under Colorado law are of equal probability. Third, Mr. Kramer testified that if the partnership interests had been minority interests in a closely held corporation, then a 35-50 percent discount would have been appropriate. Mr. Kramer distinguished the K & M partnership from a closely held corporation because no individual held a majority interest in the partnership. However, we believe that a hypothetical buyer would realize that the other partners were all related and thus, in effect, a majority interest. [9] Finally, Mr. Kramer does not appear to have given proper weight to the sale of Mr. Kistler's interest. In his report, Mr. Kramer states that the circumstances surrounding this sale, including Mr. Kistler's personal relationship with the other partners and his divorce from petitioners' daughter, indicate that the sale was not at arm's length. The record in this case does not substantiate this *613 position. Despite our problems with Mr. Kramer's report, we find some merit in it. We think that, in light of the parties' stipulation of the value of the partnership as a whole, Mr. Kramer properly disregarded factors in Rev. Rul 59-60, 1959-1 C.B. 237, which pertain to the valuation of the assets. We also think that Mr. Kramer properly considered the perspective of the willing seller. In light of this, although we do not adopt Mr. Kramer's appraisal, we do give some weight to *614 his findings. After reviewing the entire record in this matter, we find that the appropriate discount to be applied to the partnership interests is 35 percent. The second issue for decision is whether petitioners are liable for the additions to tax under section 6660. Section 6660(a), which was repealed for returns due after December 31, 1989, provided that in the case of any underpayment of a tax imposed by subtitle B (relating to estate and gift taxes) which is attributable to a valuation understatement, there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributed. A valuation understatement exists if the value of any property claimed on any return is 66-2/3 percent or less of the amount determined to be the correct amount of such valuation. Sec. 6660(c). Section 6660(a) does not apply if the underpayment is less than $ 1,000 for any taxable period. Sec. 6660(d). In the instant case, the value of the gifts to the individuals, as reported on the returns, was $ 9,998; and we have determined that the correct value of these gifts is $ 10,831. [10] Similarly, the value of the gifts to the trusts, as reported on the returns, was *615 $ 41,249; and we have determined that the correct value of these gifts is $ 44,687. [11] The valuation claimed is more than 66-2/3 percent of the correct valuation. Therefore, no valuation understatement exists under section 6660(c) and the addition to tax is not applicable. Finally, we address two issues raised by petitioners in their petition. First, petitioners assign as error that: Respondent erroneously determined that each petitioner claimed $ 80,000 as the annual gift tax exclusion; each petitioner correctly claimed $ 70,000 as the annual gift tax exclusion on their respective gift tax returns.
Petitioners bear the burden of proving that respondent's determination is incorrect. Rule 142(a). Petitioners failed to address this assignment of error at either trial or on brief. Moreover, our examination of the 1984 gift tax returns which were stipulated and made part of *616 the record reveals, contrary to the facts alleged in the petition, that petitioners claimed $ 80,000 as their 1984 annual gift tax exclusion, not $ 70,000. In light of this, we find that petitioners have failed to satisfy their burden of proof and have apparently abandoned this issue. Rule 142(a); Sundstrand Corp. and Subsidiaries v. Commissioner, 96 T.C. 226, 274-275 (1991). See Ideal Basic Industries, Inc. v. Commissioner, 82 T.C. 352, 366 n.4 (1984). Petitioners also assigned as error that: Respondent erred in determining that the taxable gifts for the prior periods 1978, 1979, 1980, 1981, 1982, and 1983 are $ 244,861 instead of $ -0- as shown on Schedule B of the calendar period 8412 gift tax returns. As a result, respondent erred in determining that the tax computed on the total amount of taxable gifts for prior periods is $ 69,155 instead of $ -0- as reported by petitioners. Respondent further erred in determining the unified credit against tax allowable for the current calendar period 8412 should be decreased in the amount of $ 69,155, resulting in a net unified credit allowed by respondent of $ 27,145 instead of $ 79,300 as *617 shown on the gift tax returns.
All the gifts for the prior periods were gifts of minority interests in the partnership. The amount of taxable gifts for the prior periods is based on respondent's determination of a 10-percent minority interest discount. Petitioners also failed to address this assignment of error. However, respondent states on brief: "The size of the discount allowable for prior years should be the same as for 1984, since there has been no change in any of the relevant factors." In light of this statement and our finding today, we find that to the extent the valuations of prior years gifts are relevant to the deficiency determinations in issue, such valuations should be made by discounting the "pro rata value" of the partnership interests by 35 percent. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. We note that an actual copy of the partnership agreement is not part of the record. However, petitioners' expert witness report includes an exhibit which is a reproduction of the partnership agreement.↩
3. By pro rata value, we mean the value obtained by multiplying the percentage interest in the partnership by the net value of the assets of the partnership as stipulated by the parties.↩
4. Petitioners also presented the testimony of their accountant, Robert Hunt. Petitioners questioned Mr. Hunt on his personal knowledge of real estate trends in the Fort Collins area and on how he arrived at the value reported on petitioners' gift tax returns. Petitioners did not hold Mr. Hunt out as an expert on business interest valuations, nor do we consider him as an expert on this subject.↩
5. We note that Mr. Lindquist's report also mentions Rev. Rul. 59-60, 1959-1 C.B. 237↩, under the heading "Valuation Approach," but no mention is made of it in the portion of the report which actually values the partnership interests. 6. We note that petitioner John R. Moore, a minority-interest holder under no compulsion to sell, testified that he would not sell his interest at the discount advocated by Mr. Lindquist.↩
7. We have noted in the past that, although there is some overlap between the discount for a minority interest and the discount for lack of marketability, the two discounts are conceptually distinct. Estate of Newhouse v. Commissioner, 94 T.C. 193, 249 (1990); Harwood v. Commissioner, 82 T.C. 239, 267 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Andrews v. Commissioner, 79 T.C. 938, 952-953↩ (1982).
8. Even respondent agrees that the value of a minority partnership interest should be discounted.↩
9. See Estate of Bright v. United States, 658 F.2d 999, 1007-1008↩ (5th Cir. 1981) (en banc), stating that although family attribution is inappropriate with respect to the hypothetical buyer and seller because such attribution ascribes to those hypothetical individuals the attributes of a particular buyer or seller, a hypothetical buyer or seller might consider the identity of the other owners of the business as a relevant factor when determining the price at which the interest would be sold.
10. $ 16,663 (pro rata value of gifts) x (1.00 - .35) = $ 10,831. ↩
11. $ 68,749 (pro rata value of gifts) x (1.00 - .35) = $ 44,687.↩